# Exhibit 5

JD–26–16
Metz, WV

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
DIVISION OF JUDGES

MURRAY AMERICAN ENERGY, INC., AND
THE MARION COUNTY COAL COMPANY,
A SINGLE EMPLOYER

  and              Cases 06–CA–148388
                            06–CA–149117

UNITED MINE WORKERS OF AMERICA,
DISTRICT 31, LOCAL 9909, AFL-CIO, CLC

  and

RICHARD HARRISON AND
JESSE STOLZENFELS
    Parties-in-Interest[1]


*Clifford E. Spungen, Esq.,*
   for the General Counsel.
*Charles F. Donnelly, Esq.,*
   for the Charging Party.
*Jennifer Betts, Esq.* and
*Thomas Smock, Esq.,*
   for the Respondent.
*Tony Oppegard, Esq.* and
*Rachel Hanna, Esq.,*
   for the Parties-in-Interest.


DECISION

STATEMENT OF THE CASE

  THOMAS M. RANDAZZO, Administrative Law Judge.  This case was tried in Fairmont, West Virginia, on November 3, 2015.  The United Mine Workers of America, District 31, Local 9909, AFL–CIO, CLC (the Charging Party or Union) filed charges on March 18, 2015, in Case 06–CA–148388 and on March 30, 2015, in Case 06–CA–149117.[2]  The General Counsel

---

[1] By Order dated October 15, 2015, I granted Richard Harrison's and Jesse Stolzenfel's motion to intervene as the Parties-in-Interest.

[2] The Union filed amended ch
arges in both cases on August 13, 2015.

issued an order consolidating cases, consolidated complaint, and notice of hearing in this matter on August 26, 2015.[3] The consolidated complaint alleges that Murray American Energy, Inc., and the Marion County Coal Company, a single employer (the Respondent), violated Section 8(a)(3) and (1) of the National Labor Relations Act (the Act) by discharging employees Jesse Stolzenfels on March 5, 2015, and Richard Harrison on March 15, 2015, because they engaged in union and protected concerted activities by protesting Respondent's implementation of a performance based bonus plan that was not approved by the employees covered by the plan. The Respondent, in its answer, denied that it violated the Act as alleged.

On the entire record,[4] including my observation of the demeanor of the witnesses,[5] and after considering the briefs filed by the General Counsel, the Charging Party, the Respondent, and the Parties-in-Interest, I make the following

FINDINGS OF FACT

I. JURISDICTION

Murray American Energy, Inc., through its wholly-owned subsidiary, Marion County Coal Company, is a corporation with its headquarters in St. Clairsville, Ohio, and a facility in Metz, West Virginia, where it has been engaged in the mining of coal.

The Respondent admits, and I so find, that Murray American Energy, Inc. and Marion County Coal Company constitute a single-integrated enterprise and a single employer within the meaning of the Act. The Respondent further admits, and I so find, that annually in conducting its business operations described above, Murray American Energy, Inc. and Marion County Coal Company collectively sold and shipped from its Metz, West Virginia facility, goods valued in excess of $50,000 to points directly outside the State of West Virginia.

It is also admitted, and I so find, that Respondent has been engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act, and that the Union has been a labor organization within the meaning of Section 2(5) of the Act.

---

[3] All dates are 2015, unless otherwise indicated.

[4] Abbreviations used in this decision are as follows: "Tr." for transcript; "GC Exh." for General Counsel's Exhibit; "Jt. Exh." for Joint Exhibit; "R. Exh." for Respondent's Exhibit; "GC Br." for the General Counsel's brief; "CP Br." for the Charging Party's brief, "PIN Br." for Parties in Interest's brief; and "R. Br." for Respondent's brief.

[5] In making my findings regarding the credible evidence, including the credibility of the witnesses, I considered the testimonial demeanor of such witnesses, the content of the testimony, and the inherent probabilities based on the record as a whole. In addition, I have carefully considered the testimony in contradiction to my factual findings, but I have discredited such testimony.

## II.  Alleged Unfair Labor Practices

### A.  The Facts

5                                        1.  Background

The Marion County Mine (the mine) is an underground bituminous coal mine located in the Monongalia and Marion Counties of West Virginia.  The mine is comprised of three portal mines known as Metz, Sugar Run, and Miracle Run.  The Respondent, which is owned by Robert
10    Murray, purchased the mine from Consolidation Coal Company in December 2013.  The Respondent employs approximately 425 production and maintenance employees at the mine who are represented by the Union for the purposes of collective bargaining.  The Union has represented the bargaining unit employees for many years, and those employees are covered by the National Bituminous Coal Wage Agreement of 2011 (the collective-bargaining agreement or
15    contract).

On October 3, 2014, the Respondent notified the Union of its intent to implement a bonus plan at the mine.  In accordance with article XXII, Section (s) of the collective-bargaining agreement, all bonus plans must be submitted to a vote by the employees and approved by a
20    majority of those covered by the plan.[6]  Pursuant to the plan, monetary bonuses would be paid to miners based on "attaining pre-set production levels. . . ." (GC Exh. 3.)  On November 21, 2014, the bonus plan was submitted to a vote by the unit employees, and it was rejected.  Despite the employees' rejection of the plan, the Respondent notified the Union of its intent to implement the bonus plan effective January 15, 2015.

25

In a letter dated January 9, 2015, Local Union President Mike Payton notified the Respondent's superintendent, Brian Fredrickson, that the rank-and-file members of the Union had voted on the proposed bonus plan, and that the plan had been rejected.  Payton informed Fredrickson that he expected Respondent to "comply with the wishes of the majority of our
30    membership and not implement the plan." (GC Exh. 8.)  Notwithstanding the Union's request, and over the Union's objection, the Respondent implemented the bonus plan effective January 15, 2015.  It appears this was the first and only time that the Respondent implemented a bonus plan that had been voted down by the unit employees.[7]

35

No unfair labor practice charges were filed alleging that the Respondent's unilateral implementation of the bonus plan constituted a violation of the Act.  The Union, however, filed a grievance on January 23, 2015, protesting the plan and alleging that it violated the collective-bargaining agreement.  In an opinion dated July 7, 2015, an arbitrator upheld the Union's

---

[6] Article XXII, section (s) entitled "Bonus Plans," provides:  "(1) Procedures–Before any bonus plan can be installed, it shall be submitted to a vote by the Employees to be covered by the plan.  Provided a majority of those voting approve, the Employer may establish, revise, or terminate the plan. . . ." (GC Exh. 2.)

[7] Paul Piccolini, the Respondent's vice president of human resources and employee relations, testified that he was not aware of any other instance when the Respondent implemented a plan that the employees rejected.

grievance as a violation of the contract, and directed the Respondent to cease and desist from implementing the bonus plan.  The Respondent subsequently rescinded the bonus plan.

   2.   The unit employees protest the Respondent's implementation of the bonus plan.

   While the Union's grievance was pending, some employees continued to express their concern regarding the Respondent's implementation of the bonus plan.  When some employees informed management officials of their desire not to participate in the plan, management devised a system to register the names of the employees who did not want to participate so they would no longer receive the bonus checks generated from the plan.  That system consisted of the Respondent informing the employees to write "void" on their checks and return them to the Respondent's payroll department.  Approximately 62 employees registered their rejection of the bonus payments and opted out.  Those employees were then added to a list and they were no longer issued bonus checks.  The record establishes that several employees further expressed their displeasure with the Respondent's implementation of the bonus plan by adding written comments to their voided checks.  These comments included "Local 9909," "Proud Member," and "Proud Member 9909."

   3.   The actions of Richard Harrison pertaining to the bonus plan

   Richard Harrison worked at the mine for approximately 10 years, the last three in the position of general inside laborer.  Harrison is a union member and for 6 months held a position on the safety committee.  Harrison also served as a Miner's Representative for 9 years (also known as a "walk around"), which is a volunteer position with the Union.  Miner's Representatives walk around the mine with inspectors from the Mine Safety Health Administration, and record what the inspectors view as mine safety violations.  The mine safety inspections, when not remedied, sometimes resulted in court proceedings.  Harrison testified in two such proceedings.

   Harrison opposed the bonus plan because he believed it would adversely affect safety in the mine.  He expressed those views to John Larry, the Respondent's superintendent, by informing him that he believed the bonus plan was concerned with production, and not safety.  Harrison testified that he feared the employees would place their focus on production at the expense of safety practices, such as rock dusting, which consisted of spreading ground limestone over the coal dust covering the surfaces of the mine, thus neutralizing the explosive nature of the coal dust.  The chance of explosions from the coal dust appeared to be a significant safety concern in the mine.

   When the Respondent implemented the bonus plan despite its rejection by vote of the employees, Harrison's opposition to the plan intensified.  When he received his first bonus check in early February 2015, he did not open it, but went to Larry's office and told Larry and Wayne Conaway (the Respondent's safety director at the Sugar Run portal) that he was "totally against" the bonus program because the Union had turned it down and he "want[ed] no part of it."  Harrison testified that Larry told him, "That's free money.  Take it and shut up." (Tr. 77.)

   Harrison testified that he took his check home, still in the envelope, and upon opening it was furious because he believed "Bob" (Owner Robert E. Murray who signed the bonus check)

was "cramming it down [his] throat" despite the fact that the Union voted it down.  Harrison testified that, in anger, he wrote the first thing that came to mind on the front of his check (payable in the amount of $11.58), which was: "Void Void Kiss My Ass Bob," with "Bob" underlined twice.[8]

5

    It is undisputed that Harrison then took a picture of his check and posted it on the Union's private Facebook page where the members of Local 9909 and others could communicate about union issues and matters that affect them at work. (Tr. 53–54.)  Some of Harrison's co-workers also posted their voided checks on the Union's Facebook page in protest of the

10

Respondent's implementation of the plan, and to let other members know they opposed the implementation of the plan after the Union voted it down. (Tr. 61; 78).  Harrison then returned his voided check to the Respondent's payroll department.

    4.   The actions of Jesse Stolzenfels pertaining to the bonus plan

15

    Jesse Stolzenfels had been employed at the mine for 7 years in several mining related positions primarily at the Metz portal, and as a general inside laborer at the Sugar Run portal for approximately 1 month before his discharge.  He is a union member but has never held a position as a union official.  Stolzenfels also opposed the implementation of the bonus plan, and like

20

Harrison, he believed the plan would adversely affect safety at the mine.  Specifically, he believed employees would "slack on safety to try to get higher footage for production bonus[es]." (Tr. 109).  He testified that he voted against the plan, and felt discouraged and confused when the Respondent disregarded the employees' rejection of the plan and implemented it anyway.

25

    Stolzenfel's received two bonus program checks together.  The first bonus plan check in the amount of $3.22 was dated February 6, 2015.  However, he testified that he did not receive it until February 27, 2015, along with another bonus check in the amount of $30.00 because, as a result of his transfer from the Metz portal to the Sugar Run portal, his bonus checks and pay

30

stubs were delayed and received at the same time.  He received and opened the bonus checks at work.  He testified that immediately upon opening the $3.22 check, he wrote "Void Eat Shit Bob" on it and turned it back in to the payroll clerk.[9]  Stolzenfels directed his written comment to Owner Robert Murray because Murray implemented the bonus plan and signed the check.  Stolzenfels testified that he wrote on the check because he felt insulted "as a union-man" who

35

"voted no," and Murray implemented it anyway. (Tr. 122.)  Stolzenfels testified that he believed he never should have received the bonus checks because the employees voted against the plan, and "it went against what we did as a union." (Tr. 112.)

40

---

[8] Harrison testified that besides being furious, at that time he was experiencing stress in his personal life.  Consistent with that assertion, he testified at the hearing before the Mine Safety and Health Administration (MSHA) that he wrote "Kiss My Ass Bob" on the check because "[m]y daughter, the cancer, and all that stress piled on then I looked down and see Bob Murray decided that our vote didn't count." (Tr. 107.)

[9] Stolzenfels testified that he did not cash or return to the payroll department the second bonus plan check he received in the amount of $30.00. (Tr. 111.)

5.   The suspension with intent to discharge of Jesse Stolzenfels

On February 27, 2015, after Stolzenfels turned in his voided bonus check and returned to work, he was summoned within 1 hour and told to meet with management.  Stolzenfels met with
5  Respondent's mine superintendent, Brian Frederickson, Supervisor of Human Resources Pam Layton, Payroll Clerk Sonya Singleton, Union President Mike Payton, and Union Committeeman Don Rose.  Stolzenfels was shown his bonus check and when asked whether he wrote "Void Eat Shit Bob" on it, he denied it.  Stolzenfels testified that he untruthfully denied writing those words because he feared for his job and was upset because the employees voted on it and "should have
10  never been put in [that] predicament." (Tr. 113.)   Stolzenfels was suspended pending an investigation and was dismissed from the meeting.  Layton testified that while Rose remained in the office, they examined a vacation request document submitted by Stolzenfels that was on Singleton's desk.  Layton testified that the similarity in the handwriting on Stolzenfel's vacation request with that of the writing on the voided check was "uncanny."

15

By letter dated March 4, 2015, the Respondent suspended Stolzenfels with intent to discharge. (GC Exh. 4.)  The letter issued in Frederickson's name by Layton, notified Stolzenfels that he was suspended with intent to discharge for the following reason:

20  Violation Conduct Rule No. 4.

Insubordination (refusal or failure to perform work assigned or to comply with supervisory direction) or use of profane, obscene, abusive, or threatening language or conduct toward subordinates, fellow employees, or officials of the
25  company.

In that on February 27, 2015 you turned in your bonus check with VOID and "Eat Shit Bob" written on it in orange highlighter.

30  On March 6, 2015, a "24/48 hour meeting" was held regarding Stolzenfel's suspension with intent to discharge.[10]  In that meeting, Stolzenfels admitted writing "Eat Shit Bob" on his check.  When he was asked why he lied, he told them he felt it was a slap in the face to him as a "union-man," and that the Union voted "no" for the plan and the Respondent implemented it anyway.   Stolzenfels informed management "You lied to me.  I lied to you." (Tr. 114.)
35  Management then conveyed to Stolzenfels that they were proceeding with his discharge. Stolzenfels testified that the management officials told him that he was being discharged for profanity and violating conduct rule 4.  Consistent with that testimony, Jason Todd, the union representative who attended Stolzenfels' 24/48 hour meeting, credibly testified that Stolzenfels was informed the reason for his discharge was "because of what he wrote on his bonus check,"
40  and there was no indication that it was based on his lying. (Tr. 37.)

The Union filed a grievance alleging that Stolzenfel's suspension with intent to discharge violated the collective-bargaining agreement.  A hearing was held on March 20, 2015, before Arbitrator Betty R. Widgeon. On March 30, 2015, she issued a decision finding that the

---

[10] A 24/48 hour meeting is part of the Respondent's disciplinary process and is a meeting usually held within 24 to 48 hours after a suspension with intent to discharge letter has issued.

6

Respondent did not violate the contract when it suspended Stolzenfels with the intent to discharge him, and thereby the Union's grievance was dismissed in its entirety.

### 6.   The suspension with intent to discharge Richard Harrison

5

After Stolzenfels' 24/48 hour meeting, Layton conducted an investigation to determine whether other employees had written comments on their voided bonus checks.  There is no evidence to suggest that the Respondent initiated its investigation based on complaints about offensive or profane comments made on the bonus checks.  Instead, the record establishes that the Respondent initiated that investigation because during Stolzenfels' 24/48 hour meeting, the

10    Union questioned whether management knew of any other instances where employees had written on their voided bonus checks, and the Union then suggested that there were employees that did so without being disciplined.  After that meeting, Layton sought copies of the voided bonus checks from the Respondent's corporate office in St. Clairsville, Ohio, and discovered

15    Harrison's check.  Layton testified that she had not seen the check previously, and there is no evidence that anyone at the mine noticed the comments on the check when it was turned into the payroll office.  However, the record does reveal that some in management were aware of Harrison's comments on his voided check before it was discovered at the corporate office.  After Stolzenfels was discharged, but before Respondent uncovered Harrison's check, Superintendent

20    John Larry told Harrison he should get his check back as soon as possible because the Respondent just fired Stolzenfels, and if he did not get that check back, "they're going to fire you." (Tr. 80.)

On March 6, 2015, Harrison was directed by Layton to report for a meeting at the Metz

25    portal.  In that meeting which was attended by Layton, Union Committeeman Don Rose, and Respondent's assistant superintendent, Brandon Laxton, Layton started that meeting by questioning Harrison about posting his voided bonus check on Facebook.  Layton, who previously shown the posted check on Facebook by the payroll clerk, asked him what happened to the picture on Facebook because it was no longer there.  Harrison told her he did not know

30    what happened to it, and Layton then asked him if he wrote "Kiss My Ass Bob" on his voided check.  Harrison denied authoring the comment.  Layton then told Harrison she was going to investigate since he said he did not write the comment, and she suspended Harrison pending the investigation.

35    A meeting was held on or about March 13, 2015, at the Metz portal with the same people present.  In that meeting, Harrison continued to deny that he authored the comment on his voided check.  The Respondent formally issued Harrison a letter in that meeting informing him that he was suspended with intent to discharge.  The reasons given in the letter were identical to those given to Stolzenfels in his suspension with intent to discharge letter—violation of Conduct Rule

40    No. 4—use of profanity in that he returned his bonus check with "VOID" and "Kiss My Ass Bob" written on it in blue highlighter. (GC Exh. 6.)  In that meeting, Layton also verbally informed Harrison that he was being discharged for profanity and violation of Conduct Rule No. 4, but did not tell him that he was being discharged for lying during the investigation.

45    A grievance was filed alleging that Harrison's discharge violated the collective-bargaining agreement.  On April 3, 2015, a hearing was also held before Arbitrator Widgeon, where Harrison admitted that he wrote the comments on his voided check.  On April 27, 2015,

the arbitrator issued a decision concluding that Respondent did not violate the contract by discharging Harrison, and she dismissed the grievance in its entirety. (R. Exh. 4.)

7.   The Respondent's Employee Conduct Rules and its reason(s) for discharging
5                Stolzenfels and Harrison

The Respondent maintains Employee Conduct Rules which were in existence under its predecessor prior to the Respondent's purchase of the mine.   The rules were most recently revised by the Respondent on June 1, 2014.   As mentioned in the suspension with intent to
10   discharge letters, Conduct Rule No. 4 pertains to insubordination and the use of profanity.   It is undisputed that the rule was in effect at the time Stolzenfels and Harrison were discharged, and that that they knew about the rule.   The Marion County Coal Company Employee Conduct Rules, and in particular, Rule No. 4, states:

15        Observance of work rules is a requirement for good labor-management relations.
          In order to minimize the occasions for discipline or discharge, each employee
          should avoid conduct which violates reasonable standards of an employer-
          employee relationship including:

20        4.  Insubordination (refusal or failure to perform work assigned or to comply with
          supervisory direction) or use of profane, obscene, abusive, or threatening
          language or conduct toward subordinates, fellow employees, or officials of the
          company.

25        The record establishes that returned checks to the payroll department were not typically viewed by Robert Murray.   There is no evidence that Murray ever saw the voided checks from Stolzenfels or Harrison, or that he was aware of their comments on the voided checks prior to their suspensions with intent to discharge. (Tr. 146.)   Paul Piccolini, the Respondent's vice president of human resources and employee relations, testified that Murray had not seen the
30   checks or their written comments prior to the discharges, and that he did not notify Murray about the voided checks until after they were suspended with intent to discharge. (Tr. 140; 146.) Piccolini, who admitted that he and Layton were the two "primary players" involved in the decisions to discharge Stolzenfels and Harrison, also acknowledged that he was the person ultimately responsible for the discharges. (Tr. 148.)   He testified that Murray played no role in
35   the suspensions and discharges of Stolzenfels and Harrison. (Tr. 146.)

As mentioned above, in the suspension with intent to discharge letters, the Respondent conveyed to Stolzenfels and Harrison that they were being discharged because of what they had written on their voided bonus checks, and there was no mention that dishonesty or lying to
40   management regarding those voided checks was a basis for the discharges.   In addition, in Stolzenfels' 24/48 hour meeting on March 6, 2015, he was told he was being discharged for using profanity on his voided check in violation of Conduct Rule No. 4, but he was never informed that his discharge was based in any way on dishonesty.   Piccolini's testimony likewise reveals that he did not discharge Stolzenfels and Harrison for dishonesty or lying.   Instead, when
45   Piccolini was asked why the Respondent discharged the employees, he stated:

8

. . . [W]hen [his management subordinates] determined that the individuals had written on the checks and one of the individuals had placed the information publicly on Facebook, I concurred with the recommendation to discharge or suspend with intent to discharge [the] individuals. (Tr. 134.)

5

Pam Layton also initially testified that Stolzenfels and Harrison were discharged for the profane language on the checks, and she neglected to mention they were discharged for lying about whether they wrote the messages.  In this connection, Layton testified that they were discharged for writing "insubordinate and profane abusive language on their bonus checks instead of simply writing 'void,' and they were terminated for [violating] conduct rule no. 4." (Tr. 166.)  That testimony was consistent with the discharge letters that Layton drafted for Stolzenfels and Harrison, and which were reviewed and approved by Piccolini.  (Tr. 191.)[11] Later in her direct testimony, however, Layton contradicted her initial testimony and claimed that Stolzenfels had also been discharged because "he lied to us within our investigation."  (Tr. 172.)

10

15

Finally, Piccolini's testimony further reveals that the Respondent's decision to discharge Stolzenfels and Harrsion was allegedly based on its efforts to maintain order in its workplace. When pressed to explain the reason he differentiated between the written statements on the voided checks and the profanity used by employees in the mine, Piccolini stated:

20

In a coal mine, you have individuals working in difficult environments, closed spaces, confined, [operating] heavy equipment, and it's important that you have discipline and order in the coal mines and if you permit activity like this where anybody can say anything, especially about the chief executive officer, it develops an anarchy, and you have to have order.  (Tr. 136– 137.)

25

This testimony further reflects that Piccolini viewed the fact that the comments were directed to the Respondent's highest ranking official as significant in his determination that discharge was warranted in these matters.

30

### 8.   The use of profanity at the Respondent's mine

The record establishes that despite the existence of Conduct Rule No. 4, profane language, including the language used by Stozenfels and Harrison on their voided checks, was commonplace at the Respondent's mine.  The credible and undisputed testimony of witnesses who work on a regular basis in the mine establishes that profanity is used by employees and management personnel on a daily basis, and it is frequently directed between employees or between management and employees.  In this regard, employee Jason Todd credibly testified that in a grievance meeting in February 2015 at the Sugar Run portal, Terry Starsick, a maintenance foreman and admitted supervisor within the meaning of the Act, used offensive profanity in the presence of Managers Brian Frederickson, Pam Layton, and Dave Wilkinson.  Todd testified that

35

40

---

[11] Layton admitted that no one prevented her from including in the discharge letters that Stolzenfels and Harrison were also being discharged for lying, and that she never recommended to Piccolini, the ultimate decision maker, that the letters should also state that they were being discharged for lying. (Tr. 198.)

in that meeting, in which Starsick was accused of performing bargaining unit work by one of the employees, he responded to that employee:  "I was not working in the fucking power car you little motherfucker." (Tr. 42.)  Starsick was not informed by management that he was not to use such profanity, and he was not discharged.  (Tr. 43.)  Todd also testified that T.J. Smith, a maintenance foreman at the Sugar Run portal, who had a grievance filed against him for allegedly doing unit work, told Todd, "Did you not fucking hear me.  I said, 'take your fucking grievance and take it all the way, because I don't give a fuck.'"  (Tr. 52.)[12]  In addition, Todd testified that he heard employees say to other employees "eat shit and die" (Tr. 47), and he has heard offensive profanity used by management officials, some examples of which consisted of: "motherfucker, cocksucker, ball licker, son-of-a-bitch, and bastard." (Tr. 50.)

David Dayton, another employee at the mine, credibly testified that the phrase "kiss my ass" was used several times a day at the mine, and it was used by employees towards management, and vice versa. (Tr. 64.)  He also testified that he knows of no one who has been disciplined for using that language.  In fact, Dayton testified that he directed that phrase to management, and he was never disciplined or told not to use it. (Tr. 65.)  In addition, he testified that the phrase "eat shit" has been used on occasion between management and employees. Dayton further testified that in the mine he has seen profanity written on "date boards,[13] rides, Jeeps, miners, [and] boulders," that "you see it all over the place," and sometimes it was directed toward managers. (Tr. 70.)

Harrison credibly testified that profanity was used in the mines on an hourly basis, and he has heard profane language and obscenities by both employees and management personnel.  (Tr. 86; 89.)  Harrison testified that he has heard Superintendents Laxton and Frederickson on the mine speaker phones or "loud mouth phones" state:  "who the fuck's got my belts off?" and "I want my belts fucking turning on now." (Tr. 87; 92.)[14]  Harrison also testified that Supervisor John Larry told him "you can kiss my ass." (Tr. 88.)  In addition, on one occasion, when Larry asked Harrison if he did the work that Larry directed him to do, he told Larry:  "Yes, you can kiss my ass.  You can go look." (Tr. 88.)[15]

Stolzenfels also credibly testified that he heard profanity on a daily basis at the mine, such as "fuck," "shit," "go to hell," and "kiss my ass." (Tr. 116.)  He testified that he heard profane language used every day, "all the time," and he referred to the use of profanity as "basic language underground." (Tr. 116.)  He further testified that he used profanities himself and was never told by management to stop using that language. (Tr. 116.)

While the record establishes that profanity such as that used by Stolzenfels and Harrison was used on daily basis by both employees and managers, the record further establishes that Respondent's highest ranking management official, Robert Murray, also used profanity on several occasions when he was visiting the mine.  Harrison testified that in Murray's first meeting with employees after he purchased the mine, he told employees:  "These are my fucking

---

[12] This evidence was unrebutted as Starsick and Smith did not testify at the hearing in this matter.

[13] Dayton testified that date boards are where "fire bosses" mark the time and initials it in parts of the mine where it is deemed safe to work in. (Tr. 70–71.)

[14] These statements by Laxton and Frederickson were not rebutted.

[15] This evidence was unrebutted as Larry did not testify at the hearing.

rules, and if you don't like it, there's the fucking door." (Tr. 87.)  Stolzenfels also testified that when Murray came for a tour of the mine, while Stolzenfels was walking away as Murray approached him at the Metz portal, Murray told him:  "Fuck you if you don't want to shake my hand." (Tr. 116–117.)[16]

Paul Piccolini acknowledged that Respondent's mine, like other coal mines, is "an industrial setting," and there is "a lot of swearing" and the use of "cuss words" at the mine.  He also testified that no employees other than Stolzenfels and Harrison have been discharged for the use of profanity at the mine,[17] and that Layton has never reported to him that the use of profanity in the mine was a problem.  (Tr. 153; 161.)  Layton also acknowledged that no employees, other than Stolzenfels and Harrison, were discharged for the use of profanity.[18]  In addition, as reflected by Piccolini's testimony, there is no evidence that Murray was even aware that the written comments had been made by Stolzenfels and Harrison prior to their discharges.  (Tr. 155–156.)

### B.  The Contentions of the Parties

The General Counsel contends that Stolzenfels and Harrison were engaged in union and protected concerted activities by writing on their voided bonus checks, and that they were unlawfully discharged in violation of the Act for engaging in those activities.  The General Counsel asserts that the discharges should be analyzed under the factors set forth in *NLRB v. Burnup & Sims*, 379 U.S. 21 (1964), to determine whether the employees were engaged in protected activity at the time of the purported misconduct.  The General Counsel argues that once those factors are met, and if the conduct is alleged to have removed them from the protection of the Act, it is appropriate to apply the Board's analysis in *Atlantic Steel Co.*, 245 NLRB 814, 816–817 (1979).  The General Counsel further argues that the acts of Stolzenfels and Harrison were not so egregious as to lose the protection of the Act under *Atlantic Steel*.  Finally, the General Counsel argues that Harrison's posting of his voided bonus check on social media was also not sufficiently egregious to lose the protection of the Act under a totality of the circumstances.

The Union also alleges that the Respondent violated the Act by discharging Stolzenfels and Harrison, but it argues that this case should more appropriately be analyzed under *Wright Line*, 251 NLRB 1083 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982).  According to the Union, the employees were engaged in protected concerted activities in writing on their voided checks in protest of Respondent's blatant disregard of employees' rights

---

[16] Robert Murray did not testify at the hearing in this matter.

[17] Layton testified that in 2015, the Respondent disciplined employee Bill Reda for leaving a voice mail message on a time clerk's phone, stating:  "They ought to fucking fire your ass."  Reda was initially suspended pending discharge, but he was returned to work after serving a 20-day suspension, and the suspension was later reduced to a three day suspension in arbitration.  Reda, however, was not discharged. (Tr. 180–183; 196–197.)

[18] She also testified that there were no complaints about the use of profanity in the mine in the last 2 years, other than one incident when a couple of employees at the Sugar Run portal complained to management about some profane graffiti written in the mine.  She testified that the Respondent could not determine who wrote the profanity, but it responded to the complaint by providing the employees at the Sugar Run portal with copies of Conduct Rules.

under the collective-bargaining agreement, and their discharges for such protected actions violated the Act under a *Wright Line* analysis. The Union contends that the *Atlantic Steel* analysis is not appropriate for this case because the alleged misconduct did not occur in a conversation with a supervisor or management official. In addition to asserting that the proper analysis should be under *Wright Line*, the Union also contends that the Board's analysis of *Three D, LLC d/b/a Triple Play Sports Bar and Grill*, 361 NLRB No. 31, slip op. at 16 (2014), where the Board adopted a totality of the circumstances test, is applicable.[19] Under that additional analysis, the Union also alleges that the Respondent violated the Act by discharging Stolzenfels and Harrison.

The Parties-in-Interest allege that the employees' written comments on their bonus checks were protected activity and not so egregious as to lose the Act's protection. They contend that under *Wright Line*, there is prima facie evidence that the miners' protected activity was a motivating factor in their discharges, and that the reasons for the discharges were pretextual because Stolzenfels and Harrison were treated differently from other miners and managers who used profanity in the mine. They further argue that *Atlantic Steel* is not applicable to the present case because this case does not involve face-to-face confrontations with supervisors. Nevertheless, they contend that if *Atlantic Steel* is found to be applicable, the factors should favor protection of the conduct. Finally, the Parties-in-Interest argue that deferral to the arbitration awards in this case which uphold the discharges as not being violations of the collective-bargaining agreement is not appropriate because the awards conflict with Board precedent and the arbitrator failed to consider whether the conduct was protected under the Act.

Despite the contentions of the General Counsel, the Charging Party, and the Parties-In-Interest, the Respondent argues that Stolzenfels and Harrison were not engaged in protected concerted activities, and even if they were, under *Atlantic Steel*, they lost the protection of the Act. The Respondent further argues that even if *Atlantic Steel* is not applicable to the facts of this case, a totality of the circumstances establishes that their conduct lost the Act's protection. Finally, the Respondent contends that Stolzenfels' and Harrison's dishonesty provided an independent and legally sufficient basis for their discharges, relying on *Fresenius*, 362 NLRB No. 130 (2015).

### C.  Analysis

1. Stolzenfels and Harrison engaged in union activity and concerted activity for the purpose of mutual aid and protection

The National Labor Relations Act prohibits employers from discriminating against employees by discharging them on the basis of their union activities and/or for discharging them for exercising their organization and collective-bargaining rights, including their right to engage in concerted activities for the purpose of mutual aid and protection. See *MCPC Inc. v. NLRB*, 813 F.3d 475, 479 (3rd Cir. Feb. 12, 2016).

---

[19] However, the Union also argues that even under an *Atlantic Steel* analysis, the Respondent violated the Act by discharging Stolzenfels and Harrison.

In this case, the Respondent's implementation of the bonus plan after it was rejected by a vote of the employees, was a matter affecting the employees' terms and conditions of employment, such as their workplace safety. It was also arguably a violation of the terms of the collective-bargaining agreement which prohibited the implementation of bonus plans without a favorable vote from the unit employees. It is undisputed that the Union and many of the unit employees took exception to the Respondent's unilateral implementation of the bonus plan after it was voted down by the employees. It is likewise undisputed that the Union and many unit employees were distressed and angered by the fact that the Respondent ignored the employees' desires and instead forced the bonus plan on the employees. The Union expressly requested in writing that the Respondent abide by the employees' and the Union's desire to reject the plan, and some union officials and unit employees verbally expressed their displeasure with the implementation of the plan over their wishes, which they believed would have an adverse impact on safety in the mines, and which was contrary to and in violation of the terms of the collective-bargaining agreement.

The employees who objected to the Respondent's unilateral implementation of the bonus plan and refused to participate in the plan by returning their voided checks to payroll department were engaged in union activities and support of the Union's protest of the Respondent's implementation of that plan. Likewise, the employees who wrote comments on their voided bonus checks, such as "local 9909," "proud member," and "proud member 9909," and returned them to the Respondent's payroll department, were clearly engaged in activities in support of the Union's protest of the Respondent's action. I find that Stolzenfels' and Harrison's return of their voided checks and written comments were engaged in actions which were part of the Union's and its members' opposition to the Respondent's unilateral implementation of the bonus plan, and therefore constituted union activity and actions in support of the Union.

Besides constituting union activity, there is a question whether Stolzenfels and Harrison were engaged in protected concerted activity. The Board has held that an employee's conduct must be both "concerted" and engaged in for the purpose of "mutual aid or protection" for it to be protected under Section 7 of the Act. *Fresh & Easy Neighborhood Market*, 361 NLRB No. 12, slip op. at 3 (2014). The Supreme Court held that Congress did not intend to limit the protection of Section 7 of the Act to situations "in which an employee's activity and that of his fellow employees combine with one another in any particular way." *NLRB v. City Disposal Systems*, 465 U.S. 822, 835 (1984). The Court also held that "mutual aid or protection" concerns "the goal of concerted activity; chiefly, whether the employee or employees involved are seeking to 'improve terms and conditions of employment or otherwise improve their lot as employees.'" *Eastex, Inc. v. NLRB*, 437 U.S. 556, 565 (1978). The "concertedness" and "mutual aid or protection" elements under Section 7 are analyzed under an objective standard, whereby motive for taking the action is not relevant to whether it was concerted, nor is motive relevant to whether it was for "mutual aid or protection." *Fresh & Easy Neighborhood Market*, supra, slip op. at 3.

The Board defined concerted activity in *Meyers Industries (Meyers I)*, 268 NLRB 493 (1984), remanded sub nom. *Prill v. NLRB*, 755 F.2d 941 (D.C. Cir. 1985), cert. denied 474 U.S. 948 (1985), as activity "engaged in with or on the authority of other employees, and not solely by and on behalf of the employee himself." The Board clarified that definition of concerted activity in *Meyers II*, 281 NLRB 882 (1986), affd. sub nom. *Prill v. NLRB*, 835 F.2d 1481 (D.C. Cir. 1987), cert. denied 487 U.S. 1205 (1988), to include cases "where individual employees

seek to initiate or to induce or to prepare for group action, as well as individual employees bringing truly group complaints to the attention of management." Id. at 887.

In this case, both Stolzenfels and Harrison, albeit by single and individual actions, sought
5   to bring to management's attention the group complaints against the implementation of the bonus plan which they believed could adversely affect mine safety, and their complaints that its implementation against the employees' desires constituted a violation of the collective-bargaining agreement.  Stolzenfels' and Harrison's actions were in participation of an ongoing dispute over the Respondent's unilateral implementation of the bonus plan.  Their voided checks
10  and their written statements, like those of their coworkers who wrote comments such as "local 9909," "proud member," and "proud member 9909," were actions designed to induce and support the protest of the Respondent's implementation of the program, and a furtherance or continuation of the Union's and the employees' protest of an action they believed would adversely affect their safety and their contractual and collectively bargained right to reject such a
15  bonus program.  The Board has found that such "ostensibly individual activity may in fact be concerted activity if it directly involves the furtherance of rights which inure to the benefits of fellow employees." *Anco Insulations, Inc.*, 247 NLRB 612, 613 (1980); see also *Alleluia Cushion Co.*, 221 NLRB 999, 1000 (1975).  I therefore find that under established Board law Stolzenfels and Harrison were engaged in concerted activity.
20

I further find that Stolzenfels' and Harrison's conduct was for the purpose of mutual aid or protection.  It is well established that the "mutual aid or protection" clause encompasses "much legitimate activity [by employees] that could improve their lot as employees." *Eastex*, 437 U.S. at 567; *Fresh & Easy Neighborhood Market*, supra slip op. at 5.  Here, Stolzenfels' and
25  Harrison's voided checks and their written comments were in furtherance of the mutual aid or protection of employees' rights to work in a safe environment.  In addition, their conduct was in furtherance of protecting their contractual rights under the collective-bargaining agreement to reject the implementation of proposed bonus plans.  Their voided checks and written comments were not merely personal actions in opposition to the Respondent's implementation of the plan,
30  but rather an attempt to protect mine safety and the contractual rights of all the unit employees, and therefore actions related to improving the employees' conditions of employment. See *Asplundh Tree Expert Co. v. NLRB*, 365 F.3d 168, 172 at fn.3 (3d Cir. 2004).

Evidence that Stolzenfels and Harrison were engaged in protected concerted activities is
35  also found in the fact that their voided checks and written comments were part of the sequence of events concerning the Union's and the employees' opposition to the Respondent's unilateral implementation of the bonus plan after the employees voted to reject it, and which violated the collective-bargaining agreement.  This dispute concerning working conditions and contractual rights was evinced by the employees' vote to reject the bonus plan, the union president's written
40  request that the Respondent not violate the terms of the collective-bargaining agreement by implementing the rejected plan, the Union's grievance protesting the Respondent's actions as a violation of the collective-bargaining agreement, a number of employees (at least 62) who protested the plan by voiding and rejecting their bonus checks, several employees who made written comments on their voided checks such as "local 9909," "proud member," and "proud
45  member 9909," and several employees, including Harrison, who posted their voided checks on the Union's Facebook page to show their opposition to the implementation of the plan.  The Board has found such single actions by employees such as Stolzenfels and Harrison, that are part

of their participation in an ongoing dispute between employers and employees, constitutes protected concerted activities. *Pier Sixty, LLC*, 362 NLRB No. 59, slip op. at 24 (2015), citing *Media General Operations, Inc., d/b/a The Tampa Tribune*, 351 NLRB 1324, 1325 (2007), enf. denied 560 F.3d 181 (4th Cir. 2009); *Circle K Corp.*, 305 NLRB 932, 933–934 (1991), enfd. 989
5   F.2d 498 (6th Cir. 1993).

    2.  Stolzenfels' and Harrison's written comments were not sufficient to remove the
        protection of Section 7 of the Act

10       It is well established that although employees are permitted some leeway for impulsive behavior when engaged in protected activity, this leeway is balanced against "an employer's right to maintain order and respect." *Piper Realty*, 313 NLRB 1289, 1290 (1994); *Tampa Tribune*, 351 NLRB 1324, 1325–1326 (2007).  Piccolini's testimony reveals that the discharges of Stolzenfels and Harrison for writing the comments "Void Eat Shit Bob" and "Void Void Kiss
15  My Ass Bob" on their bonus checks, was allegedly based on the Respondent's belief that the comments were an affront to maintaining order in its workplace.  According to Piccolini's testimony, the discharges were warranted because "it's important that you have discipline and order in the coal mines and if you permit activity like [that of Stolzenfels and Harrison] where anybody can say anything, especially about the chief executive officer, it develops an anarchy,
20  and you have to have order." (Tr. 136–137.)

         When an employee engages in abusive or indefensible misconduct during activity that is otherwise protected, the employee forfeits the Act's protection.  *DaimlerChrysler Corp.*, 344 NLRB 1324, 1329 (2005).  The Board has held that the standard is high for forfeiting the
25  protection of the Act, stating that protected conduct must be egregious or offensive to lose the protection it is provided.  *Consolidated Diesel*, 332 NLRB 1019, 1020 (2000) (citations omitted), enfd. 263 F.3d 345 (4th Cir. 2001).  In this regard, the Board has determined that "the manner in which an employee exercises a statutory right must be extreme to be beyond the Act's protection." Id. See also *Trus Joist Macmillian*, 341 NRLB 369, 371 (2004).

30

         In *Atlantic Steel Co.*, 245 NLRB 814 (1979), the Board set forth the test for determining whether an employee loses the protection of the Act.  Under that test, the Board balances four factors:  (1) the place of the discussion; (2) the subject matter of the discussion; (3) the nature of the employees' outburst; and (4) whether the outburst was, in any way, provoked by the
35  employer's unfair labor practices." Id. at 816.  This multifactor framework enables the Board to balance employee rights with the employer's interest in maintaining order in its workplace. *Three D, LLC d/b/a Triple Play Sports Bar and Grille*, 361 NLRB No. 31, slip op. 4 (2014); See *Plaza Auto Center, Inc.*, 355 NLRB 493, 494 (2010), enfd. in part 664 F.3d 286 (9th Cir. 2011), decision on remand 360 NLRB No. 117 (2014).

40

         As mentioned above, several of the parties have argued that *Atlantic Steel* is not applicable to the instant matter because it did not involve face-to-face confrontations with management officials.  I disagree.  While it is true the Board has typically applied the *Atlantic Steel* analysis to situations where face-to-face workplace conversations have been alleged to
45  infringe on employers' rights to maintain workplace order, the Board has not held that it will limit that analysis only to verbal face-to-face confrontations.  The Board has also not held that it would preclude the *Atlantic Steel* analysis from cases that do not fit squarely into the usual verbal

workplace confrontations between employees and management, such as in the case at hand where the "confrontation" was in the form of written comments submitted to management in the workplace.  The fact that the comments were written, as opposed to verbal, did not make them any less confrontational.  In addition, the fact that the comments were not submitted directly to
5   Robert Murray, but instead to Respondent's payroll department (and then presumably to management), did not, in the eyes of the Respondent's managers such as Piccolini and Layton, make the comments any less of an perceived assault on Respondent's ability to maintain order and discipline in its workplace.  The *Atlantic Steel* analytical framework is sufficiently suited to address and balance the protections of Stolzenfels' and Harrison's Section 7 activities against the
10  Respondent's interest in maintaining order in the workplace, and therefore, I find it is applicable to this case.  However, as set forth below, I further find that the analysis of other factors involved in this case, such as the fact that Respondent based Harrison's discharge in part on his posting the comments on social media, and the fact that Respondent has argued that even in the absence of the union and protected concerted activities it lawfully discharged the employees because they
15  lied about authoring the comments in question, warrant the application of different analytical frameworks.

        Also, in regard to the applicable legal standard to be applied in this case, the General Counsel asserts that the appropriate analysis should be under the standards set forth by the U.S.
20  Supreme Court in *NLRB v. Burnup & Sims*, 379 U.S. 21 (1964), under which a violation of Section 8(a)(1) occurs when the discharged employee was engaged in protected activity at the time of the purported misconduct, the employer knew of the protected activity, the basis of the discharge was the employee's alleged misconduct in the course of the protected activity, and the employee was not actually guilty of the misconduct.  The Board has held that under *Burnup &*
25  *Sims*, an employer violates the Act by "disciplining or discharging an employee based on a good-faith belief that the employee engaged in misconduct during otherwise protected activity, if the General Counsel shows that the employee was not, in fact, guilty of misconduct." *Triple Play Sports Bar & Grille*, supra, slip op. 6 fn. 20.  The Board pointed out that, as the Supreme Court explained, "Otherwise the protected activity would lose some of its immunity, since the example
30  of employees who are discharged on false charges would or might have a deterrent effect on other employees." Id., citing *Burnup & Sims*, supra at 23.  The Board therefore has held that *Burnup & Sims* "applies in cases involving mistakes of fact, not mistakes of law." Id.  In the instant case, while the Respondent may have mistakenly believed that Stolzenfels' and Harrison's comments on their voided checks, and Harrison's posting his check on Facebook,
35  were unprotected, there is no dispute that they did in fact make those comments and that Harrison posted the comments on social media.  Since this is not a "mistake of fact" case, I find that *Burnup & Sims* does not apply.

        In the instant case, an examination of the *Atlantic Steel* factors reveals that Stolzenfels'
40  and Harrison's conduct consisting of their written comments on their voided checks, did not rise to the level which would warrant losing the protection of the Act.  The first factor, "the place of the discussion," weighs in favor of finding that the conduct did not remove the protection of the Act.  The place of the "discussion" for Stolzenfels' written outburst "Void, Eat Shit Bob" was in the payroll office where it was only seen by the payroll clerk and subsequently by management.
45  Likewise, Harrison's outburst "Void Void Kiss My Ass Bob" was also turned into the payroll department, but there is no evidence that the payroll clerk or anyone else viewed or noticed the written comments when it was turned in.  In fact, Harrison's comment was not discovered by the

16

Respondent until, during Stolzenfels' meeting regarding his comment, it was brought to the attention of management that others had written on their voided checks, and the Respondent conducted a search of the voided checks that had been shipped to its corporate headquarters in Ohio.

With regard to the place of the discussion, there is no evidence that any unit employees saw these checks or comments when they were turned into management.  In fact, there is no evidence that Robert Murray, the subject of the remarks, saw the comments or was even aware of them prior to the discharges.  Even though Harrison's check was seen by some employees when it was posted on Facebook, the Respondent did not allege, and there is no evidence, that it in any way undermined workforce discipline.  The written statements or "outbursts" did not occur in the work space of the mine where it might have been witnessed by other employees during the work day.  *Plaza Auto Center, Inc.*, 360 NLRB No. 117, slip op. at 7 (2014).  In addition, there is no evidence that the statements disrupted any work processes.  See e.g. *Alcoa, Inc.*, 352 NLRB 1222, 1226 (2008); *Noble Metal Processing*, 346 NRLB 795, 800 (2006).  In fact, the evidence failed to establish that Stolzenfels' and Harrison's comments on their voided checks had any negative impact on the Respondent's work process or its workplace discipline.

The second factor, the "subject matter of the discussion," weighs in favor of protection.  The statements directly involved the Respondent's implementation of the bonus plan which concerned terms and conditions of employment such as safety.  The remarks, while profane and offensive, were nevertheless expressions of protest and outrage over what those employees viewed as implementation of a plan that would adversely affect their safety conditions and which constituted what the employees believed was a surprising violation of the terms of the collective-bargaining agreement.  In this connection, Piccolini testified that while he has been in the industry for nearly thirty years, he could not recall any other time that the Respondent had implemented a bonus plan after it was opposed by the Union and rejected by the unit employees.  The Board has found that union-supported protests of an employer's enforcing policies affecting working conditions that employees reasonably considered to be unsafe, weighed in favor of protection under this second factor.  *Kiewit Power Constructors Co.*, 355 NLRB 708, 709 (2010), enfd. 652 F.3d 22 (D.C. Cir. 2011).

The third factor, the nature of the alleged "outburst," also weighs in favor of protection.  In assessing whether an employee's protected conduct loses the protection of the Act, the Board recognizes that disputes over working conditions are the type most likely to cause ill feelings and strong responses. *Kiewit Power*, supra at 710, citing *Consumers Power*, supra at 132.  The Board has held that in determining whether conduct is removed from the protection of the Act, it determines whether the conduct is "so violent or of such serious character as to render the employee unfit for further service." *St. Margaret Mercy Healthcare Centers*, 350 NLRB 203, 204-205 (2007), enfd 519 F.3d 373 (7th Cir. 2008).  In an attempt to distinguish between protected conduct that maintains the Act's protection from that which is so egregious that it loses its protection, the Board has found that a line "is drawn between cases where employees engaged in concerted activities that exceed the bounds of lawful conduct in a moment of animal exuberance or in a manner not motivated by improper motives and those flagrant cases in which the misconduct is so violent or of such a character as to render the employee unfit for further service." *Kiewit Power*, supra at 710, citing *Prescott Industrial Products Co.*, 205 NLRB 51, 51–52 (1973).

In assessing whether Stolzenfels' and Harrison's union and protected concerted activities lost the protection of the Act, I note that their use of "eat shit" and "kiss my ass," and their direction of those comments to Murray, while certainly offensive and profane, were not threatening.[20]   The comments were not made in face-to-face confrontations, and they did not convey a threat of violence to Murray or any other manager in any way.   In fact, there is no evidence that Murray had seen or even was aware of the comments before the employees were discharged.   In addition, nothing about the comments suggests that the remarks portend physical confrontation.   There is also no evidence that Stolzenfels or Harrison had committed any violent acts, had attempted to commit violent acts, or had threatened to commit violent acts during their tenure with the Respondent.   *Plaza Auto Center*, 360 NLRB slip op. at 5.   Moreover, the Respondent has not alleged, nor has the record shown, that the statements were "menacing, physically aggressive, or belligerent." *Plaza Auto Center*, supra, slip op. at 3.

Stolzenfels' and Harrison's outburst also did not consist of a planned out and deliberate series of profane insults or sustained personal threats against Murray.   Their comments were single spontaneous written reactions in moments of exuberance when they opened their bonus checks and were offended by the fact that the Respondent ignored the employees' vote to reject the bonus plan, implemented the plan in violation of the collective-bargaining agreement, and conceivably disregarded the employees' concerns for safety in the mines.   The Board has held that such statements which are "single, brief, and spontaneous reactions by each employee [and] not premeditated and sustained personal threats. . ." are not sufficient to remove the protection of the Act from the protected activities.   *Kiewit Power*, supra at 710; see also *Burle Industries*, 300 NLRB 498 (1990), enfd. 932 F.2d 958 (3d Cir. 1991).[21]

In analyzing the nature of the outburst, the Respondent argues that the statements violated its Conduct Rule No. 4.   However, the fact that the employees' comments may have violated the Respondent's rules does not necessarily mean that they lost the Act's protection.   The Board has held that employees who are engaged in protected activities "generally do not lose the protective mantle of the Act simply because their activity contravenes an employer's rules or policies." *LaGuardia Associates, LLP d/b/a Crowne Plaza LaGuardia*, 357 NLRB 1097, 1101 (2011), citing *Louisiana Council No. 17*, 250 NLRB 880, 882 (1980).   In addition, in analyzing the nature of the outburst, consideration must be given to the undisputed fact that profanity was dispensed liberally in the Respondent's workplace.   Profanity, such as that used by Stolzenfels and Harrison, was used by both employees and management on a daily basis, and was frequently

---

[20] While Piccolini testified that he considered the comments to be threats, he was unable to define the manner in which they were allegedly threatening, stating only that it was his "opinion." (Tr. 154.) Piccolini's testimony reflects his subjective opinion that the comments were threatening. Such subjective opinions, however, are "not dispositive in determining whether [the employee] forfeited [his] statutory rights." *Pier Sixty*, supra slip op. at 3 fn. 10; *Kiewit Power*, supra at 711; see also *Severance Tool Industries*, 301 NLRB 1166, 1170 (1991), enfd. mem. 953 F.2d 1384 (6th Cir. 1992) (where the Board found an employee's "disrespectful, rude, and defiant demeanor and the use of a vulgar word" while engaged in protected activity, was insufficient to cause him to lose the Act's protection, notwithstanding the employer's characterization of the conduct as "insubordinate, belligerent, and threatening").

[21] See in comparison *Trus Joist MacMillan*, 341 NLRB 369, 371 (2004), where the Board found that an employee lost the Act's protection where he planned and deliberately launched a personal attack on his supervisor that included a series of profane verbal insults.

directed from employees to management, and from management to employees.  In fact, such profanity was even used by Murray towards employees on several occasions where he told one employee "fuck you," and where he addressed a group of employees by telling them "these are my fucking rules, and if you don't like it, there's the fucking door."

5

It is also important to note that there is no evidence that the Respondent sought to correct individuals that it was aware used such profanity.  The outbursts in the workplace by managers such as Terry Starsick and T.J. Smith were not cautioned or corrected by the Respondent's upper management, and that use of offensive profanity failed to result in the issuance of discipline or discharge for those individuals.  In fact, prior to Stolzenfels and Harrison, no employees were discharged for the use of profanity, either verbal or written, and Layton never reported to upper management such as Piccolini that there were problems in the workplace with employees using profanity.  On the basis of the above, I find that the use of profanity, such as the language used by Stolzenfels and Harrison, was prevalent in the mine and was an accepted part of the miners' work environment, which further weighs in favor of finding the protection of the Act should not be removed from the employees' actions in this case.  Consistent with that finding, the Board has held that where the use of profane and vulgar language was "a daily occurrence in [the] Respondent's workplace, and [it] did not engender any disciplinary response," such a factor weighed in favor of retaining the protection of the Act.  *Pier Sixty*, supra, slip op. at 2–3.

20

In this analysis, it is also important to note that the Board has found the exact language used by Harrison was not so opprobrious as to remove the Act's protection.  In *Vincent Industrial Plastics, Inc.*, 328 NLRB 300, 306 (1999), enfd. in part 209 F.3d 727 (D.C. Cir. 2000), the Board held that the term "kiss my ass" was "relatively mild" where "street talk" on the plant floor was commonplace, and therefore it was insufficient to remove the protection of the Act.  In fact, the use of terms such as "kiss my ass" and "eat shit" appear to be relatively tame in comparison to some of the offensive and vulgar statements used by Respondent's employees and managers in the mine.

30

While Stolzenfels' and Harrison's comments were certainly offensive, the Board has found language much more offensive and profane directed to or about management officials has not been sufficient to remove the conduct from the protection of the Act.  In *Leasco, Inc.*, 289 NLRB 549 fn.1 (1988), the Board found the phrase "I'm kicking your ass right now" to be a colloquialism, and not an actual threat, and thus did not find the use of that phrase removed the Act's protection.  In *Alcoa, Inc.*, 352 NLRB 1222, 1225 (2008), the Board found an employee acting in his union representational capacity, who called a supervisor an "egotistical fucker," did not lose the protection of the Act.  In addition, in *Media General Operations, Inc. d/b/a The Tampa Tribune*, 351 NLRB 1324 (2007), where an employee engaged in protected activity told two supervisors that the employer's vice president was a "stupid fucking moron," the Board did not find that statement was sufficient to remove the protection of the Act.  See *Union Carbide Corp.*, 331 NLRB 356, 359 (2000), enfd. 25 Fed. Appx. 87 (4th Cir. 2001) (employee who called manager a "fucking liar" was found not so "out of line" as to remove him from the protection of the Act); see also, *Pier Sixty*, 362 NLRB No. 59, slip op. at 2 (2015) (in a Facebook posting the employee wrote that the assistant director "is such a nasty mother fucker. . . fuck his mother and his entire fucking family," which did not lose the protection of the Act).

  Finally, the fourth factor of whether the outburst was provoked by the employer's unfair labor practice also weighs in favor of protection.  Even though Respondent's unilateral implementation of the bonus program occurred approximately one month before Stolzenfels and Harrison had written their comments on their checks, their statements or "outbursts" were a direct result of their outrage from actually receiving and opening their bonus checks from that unilaterally imposed program.  I find that receiving the unwanted bonus payments from a program they rejected on the basis of safety concerns, and one which they had the contractual right to reject, clearly provoked the actions of Stolzenfels and Harrison.

  The Respondent argues that this factor must weigh against retaining the protection of the Act because the comments in question were not provoked by "an unfair labor practice."  While it is true that the Respondent's unilateral implementation of the bonus plan was neither alleged nor found to be an unfair labor practice, the Board has held that the absence of such a finding does not require the conclusion that the employee's conduct was unprovoked.  *Pier Sixty*, supra, slip op. at 3, fn. 4; *Battle's Transportation, Inc.*, 362 NLRB No. 17, slip op. at 1 fn. 4, 9–10 (2015). In *Pier Sixty*, an employee posted vulgar comments on Facebook about his manager, which was in response to the employee being upset about the manner in which the manager addressed employees during a dinner service they were working. Id.  In that case, on the issue of provocation, the Board specifically found that "[t]he absence of a finding that [the manager's] conduct itself constituted an unfair labor practice does not compel the conclusion that [the employee's] conduct was either unprovoked or unprotected." Id. slip op. at 3 fn. 4.  In addition, in *Battle's Transportation*, supra, the Board found that the employer's chief operating officer's statement to the employee to "shut up," although neither alleged nor found to be an unfair labor practice, was "sufficient provocation" under an *Atlantic Steel* analysis. See also *Consumers Power*, supra at 132 (employee engaged in protected activity did not lose the protection of the Act when he raised his fists in response to a manager's gesture that was neither alleged nor found to be an unfair labor practice).

  Thus, I find that all four factors of place, subject matter, nature of conduct, and provocation, favor Stolzenfels' and Harrison's protection under Section 7 of the Act.  While I do not condone Stolzenfels' and Harrison's use of profanity, or their direction of it to the Respondent's highest ranking official, under extant Board law their conduct was not so egregious as to render their union and protected concerted activities unprotected, nor was it sufficient to make them unfit for further employment.

### 3.  Harrison's posting of his voided bonus check with his written comments on social media was also not sufficient to remove the protection of the Act

  As mentioned above, while off duty and away from the workplace, Harrison posted his voided check with the written comment "Kiss My Ass Bob" on the Union's private Facebook page to show his opposition to the Respondent's implementation of the bonus plan.  Like the written comments itself, I have found that Harrison's posting of the comments on social media constitutes union and concerted activity protected by the Act.  The testimony of Piccolini reveals that besides discharging Harrison on the basis of his written comments on his voided check, he was also discharged because he "had placed the information publicly on Facebook." (Tr. 134.) In analyzing whether Harrison's posting of his voided check on social media was sufficiently egregious to lose the protection of the Act, I note that the Board has found that the *Atlantic Steel*

framework discussed above is "not well suited to address issues that arise in cases. . . involving employees' off-duty, offsite use of social media to communicate with other employees or with third parties." *Triple Play*, 361 NLRB slip op. at 3 (2014).

5         Instead, the Board has found in *Pier Sixty* that the analysis to be applied in offsite, off-duty use of social media cases is a totality of the circumstances test, which considers the following nine factors:

10         (1) Whether the record contained any evidence of the Respondent's antiunion hostility; (2) whether the Respondent provoked [the employee's] conduct; (3) whether [the employee's] conduct was impulsive or deliberate; (4) the location of [the employee's] Facebook post; (5) the subject matter of the post; (6) the nature of the post; (7) whether the Respondent considered language similar to that used by [the employee] to be offensive; (8) whether the employer maintained a specific
15         rule prohibiting the language at issue; and (9) whether the discipline imposed upon [the employee] was typical of that imposed for similar violations or disproportionate to his offense. Id.

20         The record reveals that with regard to the first factor, the Respondent displayed anti-union hostility by implementing the bonus plan despite the fact that it was rejected by a vote of the employees, thereby disregarding the employees' desires and the Union's specific request that it not implement the plan and violate the collective-bargaining agreement.  With regard to the second factor of provocation, I find the Respondent's conduct clearly and unmistakably provoked Harrison's conduct.  With regard to the third factor of whether the conduct was
25         impulsive or deliberate, Harrison's written comments were an angry and impulsive response to his belief that Respondent was forcing a bonus program on him that the employees rejected and believed would adversely affect workplace safety.  Likewise, Harrison's posting of the voided check on social media was impulsive and a result of his frustration with the Respondent's unilateral implementation of the plan.  *Pier Sixty*, supra slip op. at 3.  With regard to the fourth
30         and fifth factors, the location and the subject matter of the Facebook post, the posting was not made at work and it was on the Union's private Facebook page, so there is no evidence that it disrupted the Respondent's workplace or that it had been seen by the general public.  There is therefore no evidence that the post impacted Respondent's work environment or its relationship with its customers.  *Pier Sixty*, supra slip op. at 3, fn. 6, citing *G.T.A. Enterprises, Inc. d/b/a*
35         *Restaurant Horikawa*, 260 NLRB 197, 197–198 (1982).  Therefore, the fourth and fifth factors weigh in favor of protection.

        With regard to the nature of the post (factor six) and whether Respondent considered language similar to that used by Harrison to be offensive (factor seven), I find those factors both
40         weigh in favor of protection.  While the nature of the posted language "Kiss My Ass Bob" was offensive and distasteful, there is overwhelming and undisputed evidence that the Respondent tolerated the widespread use of profanity in the workplace and that it was part of the everyday work environment.  In fact, the evidence establishes that the phrase "kiss my ass" was frequently used by management and employees, and that even harsher language that could be considered
45         much more offensive and distasteful, was tolerated.  The Board, in *Pier Sixty*, found that in such a setting, the use of profanity in the employee's Facebook post would not cause him to lose the protection of Section 7. Id. slip op. at 3.

With regard to whether Respondent maintained a rule prohibiting the language used by Harrison (factor 8), the evidence weighs in favor of losing the Act's protection because such a prohibition was found in Conduct Rule No. 4.  However, the factor of whether the discipline imposed was typical of that imposed for similar infractions (factor 9) weighs in favor of finding the comment protected.  As mentioned above, the Respondent maintained a policy prohibiting profane and obscene language, but the evidence establishes that employees and managers who used such language were not cautioned or directed not to use it, and violations of the policy were rarely enforced.  To the contrary, the evidence establishes that for the most part, the Respondent tolerated the use of similar language.  In fact, the record reveals that only one person was disciplined for the use of abusive language (who told a fellow employee "they ought to fucking fire you"), and that employee only received a 3-day suspension, and was not discharged.  The Board found that under similar circumstances in *Pier Sixty*, the employee's conduct did not lose the protection of the Act.  *Pier Sixty*, supra slip op. at 4.

Based on an objective review of the evidence under the foregoing totality of the circumstances factors, where eight of the nine factors are in favor of retaining the protection of the Act, I find that Harrison's use of "kiss my ass" in the Facebook post of his voided check, was not so egregious as to take him outside the protection of the Act.

4.  Stolzenfels and Harrison did not lose the protection of the Act when they lied about writing the comments on their voided bonus checks

As mentioned above, both Stolzenfels and Harrison denied that they had authored the comments on their voided checks, but they subsequently admitted to the Respondent that they had been untruthful and had in fact written the comments.  In its post-hearing brief, the Respondent acknowledged that Stolzenfels and Harrison were discharged for the comments on their voided checks because it believed the comments were profane and in violation of its conduct code.  However, the Respondent also contends in its brief that Stolzenfels' and Harrison's dishonesty in lying about the fact that they authored the comments provided an independent and legally sufficient basis for their discharges, relying on the Board's ruling in *Fresenius*, 362 NLRB No. 130 (2015).

In analyzing this allegation, I note that where an employer argues that it discharged an employee for reasons unrelated to his protected activity, such as tardiness, poor work performance, or as in this case, dishonesty, the Board and the courts rely on the so-called "mixed motive" or "dual motive" discharge test set forth by the Board in *Wright Line*, 251 NLRB 1083 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982).  See also *MCPC Inc. v. NLRB*, 813 F.3d 475, 490 (3d Cir. Feb. 12, 2016).

In *Wright Line*, the Board announced the following causation test in all cases alleging violations of 8(a)(3) or violations of Section 8(a)(1) of the Act turning on employer motivation. First, the General Counsel must make a prima facie showing sufficient to support the inference that protected conduct was a "motivating factor" in the employer's decision.  On such a showing, the burden shifts to the employer to demonstrate that the same action would have taken place even in the absence of the protected conduct.  The United States Supreme Court approved and adopted the Board's *Wright Line* test in *NLRB v. Transportation Management Corp.*, 462 U.S.

393, 399–403 (1983).  In *Manno Electric*, 321 NLRB 278, 280 fn. 12 (1996), the Board restated the test as follows.  The General Counsel has the burden to persuade that antiunion sentiment was a substantial or motivating factor in the challenged employer decision.  The burden of persuasion then shifts to the employer to prove its affirmative defense that it would have taken
5   the same action even if the employee had not engaged in protected activity.

To establish the initial burden under *Wright Line*, the elements commonly required to support such a showing are union or protected activity by the employee, employer knowledge of that activity, and animus against that activity on the part of the employer.  *Mesker Door*, 357
10   NLRB 591, 592  fn. 5 (2011); *Donaldson Bros. Ready Mix, Inc*., 341 NLRB 958, 961 (2004); *L.B.&B. Associates, Inc. d/b/a North Fork Service Joint Ventures*, 346 NLRB 1025, 1026 (2006); *Willamette Industries*, 341 NLRB 560, 562 (2004); See also *DHL Express (USA), Inc.*, 360 NLRB No. 87 (2014).  Proof of discriminatory motivation can be based on direct evidence or can be inferred from circumstantial evidence based on the record as a whole. *Mesker Door*, supra,
15   slip op. at 2; See *Fluor Daniel, Inc.*, 304 NLRB 970 (1991).  As support for an inference of unlawful motivation, the Board may rely on, among other factors, disparate treatment of the affected employee and the timing of the discipline relative to the employee's protected activity. *Mesker Door*, supra; See *Embassy Vacation Resorts*, 340 NLRB 846, 848 (2003).  In addition, the Board may infer animus against protected activities from pretextual reasons given for the
20   adverse employment action.  *DHL Express*, supra, slip op. at 1 and fn. 1 (2014).

On such a showing, the burden shifts to the Respondent to demonstrate that the same action would have taken place even in the absence of the protected conduct.  *Lucky Cab Co.*, 360 NLRB No. 43, slip op. 6 (2014); *Austal USA, LLC*, 356 NLRB 363, 364 (2010).  This burden
25   may not be satisfied by an employer's proffered reasons that are found to be pretextual, (i.e. false reasons or reasons not in fact relied upon for the adverse employment action).  Rather, it is well established that a finding of pretext defeats an employer's attempt to meet its rebuttal burden. *Lucky Cab Co*., supra, slip op. at 6; *Stevens Creek Chrysler Jeep Dodge*, 357 NLRB 633, 637 (2011), enfd. sub nom. *Mathew Enterprise, Inc. v. NLRB*, 498 Fed. Appx. 45 (D.C. Cir. 2012).
30   In addition, it is apparent that the Respondent does not sustain its burden by simply showing that a legitimate reason for the action existed.  As the Board stated in *Roure Bertrand Dupont, Inc.*, 271 NLRB 443 (1984):

We have held that the burden shifted to an employer under *Wright Line* is one of
35   persuasion, and affirmative defense in which the employer must demonstrate by a preponderance of the evidence that the same action would have taken place even in the absence of the protected conduct.  If an employer fails to satisfy its burden of persuasion, the General Counsel's prima facie case stands unrefuted and a violation of the Act may be found.  See *Wright Line*, 251 NLRB at 1088 fn. 11;
40   *Bronco Wine Co*., 256 NLRB 53 (1981); *Rikal West, Inc.*, 266 NLRB 551 (1983). Cf. *Magnesium Casting Co*., 259 NLRB 419 (1981).

Therefore, in rebutting the General Counsel's prima facie showing that the protected conduct was a "motivating factor" in the Respondent's decision, Respondent cannot simply
45   present a legitimate reason for its action but must persuade, by a preponderance of the evidence, that the same action would have taken place even in the absence of the protected conduct.

Based on the record evidence, I find that an analysis under *Wright Line* demonstrates that Stolzenfels' and Harrison's discharges were discriminatorily motivated.

      i.      The General Counsel made a prima facie case of discrimination.

5

First, the General Counsel has made a prima facie showing that Stolzenfels' and Harrison's union and protected conduct were "motivating factors" in the Respondent's decision to discharge them.  In fact, the Respondent admits their protected conduct was the reason they were discharged, as it is undisputed that they were discharged for their comments on their voided
10  bonus checks, actions which I have found constitute union activity and concerted activity for the purpose of mutual aid and protection.  There is likewise no question that Respondent was aware of these union and protected concerted activities, and that the Respondent harbored animus toward the Union by virtue of the fact that it unilaterally implemented the bonus plan contrary to the Union's desires and in violation of the collective-bargaining agreement.

15

On such a showing, the burden shifts to the Respondent to demonstrate that Stolzenfels and Harrison would have been discharged even in the absence of the protected conduct.  As mentioned above, the burden is not sustained by showing a legitimate reason for the discharge existed, but instead the Respondent must demonstrate by a preponderance of the evidence that
20  they would have been discharged even in the absence of his protected conduct.  *Roure Bertrand Dupont, Inc.*, supra.  For the reasons set forth below, I find the record establishes that the Respondent's asserted reason is pretext for its unlawful motivation.

      ii.     The Respondent's asserted reason that Stolzenfels and Harrison were discharged
25               for dishonesty is without merit and is pretext for its unlawful motivation.

The Respondent argues that it would have discharged the employees even in the absence of their protected activities, because it had a proper and independent basis to discharge them for their dishonesty.  With regard to the basis for their discharges, in the suspension with intent to
30  discharge letters, both of which were issued to the employees before they admitted that they had lied about authoring the comments, Respondent informed Stolzenfels and Harrison that they were being discharged because of what they had written on their voided bonus checks.  There was no mention that lying to management about writing those comments served as a basis for their discharges.  In addition, there was no mention in the employees' 24/48 hour meetings that
35  their discharges were based on their admitted dishonesty.  In fact, Piccolini's testimony did not reveal that he based his decision to discharge them on their dishonesty.  Layton, however, while initially testifying that the employees were discharged for the profane language on the checks, later testified that they had also been discharged because they lied to Respondent during the investigation.

40

I find Layton's testimony that dishonesty was an independent basis for Stolzenfels' and Harrison's discharges is not credible, nor is it plausible.  Instead, I find that their dishonesty was, as Layton stated at the hearing, "circumstances that [Respondent] took into consideration in [its] investigation" (Tr. 197), but not an independent basis for the discharge establishing that the
45  employees would have been discharged even in the absence of their union and protected concerted activities.

While the operative facts of this case are essentially undisputed and do not require determinations with regard to credibility, this particular point of Layton's testimony does warrant evaluation as it is relied on by the Respondent as a purported independent basis for the discharges.  Credibility determinations may rely on a variety of factors, including the context of the witness' testimony, the witness' demeanor, the weight of the evidence, established or admitted facts, reasonable inferences that may be drawn from the record as a whole, and the inherent probabilities of the allegations. *Double D Construction Group*, 339 NLRB 303, 305 (2003); *Daikichi Sushi*, 335 NLRB 622, 623 (2001) (citing *Shen Automotive Dealership Group*, 321 NLRB 586, 589 (1996)), enfd. 56 Fed. Appx. 516 (D.C. Cir. 2003).  Credibility findings need not be all or nothing propositions.  Indeed, nothing is more common than for a judge to believe some, but not all, of the testimony of a witness.  *Daikichi Sushi*, 335 NLRB at 622; *Jerry Ryce Builders*, 352 NLRB 1262 fn. 2 (2008), citing *NLRB v. Universal Camera Corp.*, 179 F.2d 749, 754 (2d Cir. 1950), revd. on other grounds 340 U.S. 474 (1951).  My observation during the trial was that while the General Counsel's witnesses appeared sincere and honest in their demeanor, and they testified in a convincing and straightforward manner, the Respondent's witnesses testified in a less convincing manner, and Layton, in particular, presented testimony that was at times guarded and defensive.  Specifically, I do not credit her testimony that dishonesty was a basis for the discharges.  Stolzenfels and Harrison were informed, both verbally and in writing, that they were discharged because of the profanity they used on the voided checks, and not for lying.  Layton also presented shifting reasons for the discharges which undermines the veracity of her assertion. While she initially testified the employees were discharged for their written comments, she later contradicted herself by testifying that dishonesty was also a basis for the discharges.  Importantly, Layton's assertion was also inconsistent with Piccolini's testimony because he never asserted that dishonesty was a basis for the decisions to discharge the employees.  Critically, the Respondent never offered any explanation as to why Layton's assertion was inconsistent with Piccolini's testimony.

In addition, I find Layton's assertion implausible.  Layton was directly involved in the decisions to discharge, and she personally drafted the discharge letters.  However, she failed to include any reference to their having lied about authoring the comments on their voided checks as a basis for their discharges.  Furthermore, when she informed Stolzenfels and Harrison in person that they were being discharged, she neglected to make any mention of their dishonesty.  I simply find it implausible and unbelievable that Layton would neglect to inform the employees, both verbally and in writing, that dishonesty was a basis for their discharges, if in fact that were true.

The Board has found shifting defenses where the employer's reason for discharge offered at trial differed from what was set forth in the letter of discharge.  *City Stationery, Inc.*, 342 NLRB 523, 524 (2003). The Board has also found that existence of shifting explanations or reasons for an employer's adverse employment action are persuasive evidence that the asserted reasons are pretextual and evidence of discriminatory motivation.  *Lucky Cab Co.*, 360 NLRB No. 43, slip op. at 4 (2014); *Naomi Knitting Plant, A Division of Andrex Industries Corp.*, 328 NLRB 1279, 1283 (1999), citing *York Products, Inc. d/b/a Mastercraft Casket Co.*, 289 NLRB 1414, 1420 (1988), enfd. 881 F.2d 542 (8th Cir. 1989).  Therefore, I find that the Respondent's asserted reason is pretextual, and the facts of this case warrant finding that the Respondent's true motive was unlawful. *Shattuck Denn Mining Corp. v. NLRB*, 362 F.2d 466, 470 (9th Cir. 1966); *L.B.&B. Associates, Inc.*, d/b/a *North Fork Services Joint Ventures*, 346 NLRB 1025, 1027

(2006).  On that basis, the Respondent failed to show that it would have taken the same actions in the absence of the employees' union and protected concerted activities.

5

Finally, I find that the Respondent's reliance on *Fresenius USA Manufacturing, Inc.*, supra, in support of its assertion that Stolzenfels and Harrison were lawfully discharged for dishonesty, is misplaced.    In *Fresenius*, the discriminatee anonymously wrote offensive statements on posted union literature which was viewed by female employees as offensive and threatening. Id. slip op. at 1.    During the employer's investigation of the statements, the discriminatee committed two acts of dishonesty—he lied about authorship of the statement and

10   then attempted to conceal his identity as the confessor. Id.    The Board found that the employer had a right "to question an employee about facially valid claims of harassment and threats, even if that conduct took place during the employee's exercise of Section 7 rights." Id.   These facts of *Fresenius* however, are distinguishable from the instant case where Stolzenfels' and Harrison's statements were profane, but did not constitute harassment and were not threatening.

15

In *Fresenius,* the Board also found the discriminatee's dishonesty "did not implicate a legitimate interest in shielding his Section 7 activity from employer inquiry" because he "had no reasonable basis to believe Fresenius was attempting to pry into protected union activity generally or that he would suffer reprisal for the activity in question because of its prounion

20   content." Id. slip op. at 2.   That is different from the instant case where the Respondent's questioning of Stolzenfels and Harrison was clearly prying into their union and protected activities, and they both feared that they would be subject to discipline for those activities.   In addition, in the instant case, there is no evidence that other employees had been discharged for lying or for being dishonest, while in *Fresenius* there was evidence that the discharge of the

25   discriminatee was consistent with discipline it had imposed for similar violations in the past. Id. Thus, I find *Fresenius* is distinguishable from the facts of the instant case.

It is also important to note that Stolzenfels and Harrison were untruthful because the Respondent sought information pertaining to their union and protected activities, and they both

30   feared that disclosure would result in their discharge, which in fact turned out to be true.   In addition, the dishonesty did not affect their ability to perform their jobs, it did not interfere with the work of the other employees, and it had no impact on the Respondent's ability to conduct its business.  While the facts of *Fresenius* are distinguishable from the instant case, in similar cases where employees have lied in response to employer questions which pry into their protected

35   activities, the Board has found the employees were under no obligation to respond truthfully to such questioning.   In *Paragon Systems, Inc.*, 362 NLRB No. 182 (2015), which is factually similar to the instant case, when questioned by the employer, employees Baker and Holland falsely denied that they engaged in the protected activity of delivering a strike notice.   The employer argued that the discipline was justified because the employees lied to management

40   about the protected activity of delivering the strike notice.  Id. slip op. at 5.  The Board, however, disagreed, finding that Baker and Holland had a reasonable basis to believe the employer was prying into protected union activity and they would be disciplined for that activity. Id.  Under

those circumstances, the Board found Baker and Holland were under no obligation to respond to questions which sought to uncover their protected activities.  Id.[22]

5      The Board has also held that "an employer may not discharge an employee for lying in response to such questions." Id. slip op. at 5; see e.g., *Tradewaste Incineration*, 336 NLRB 902, 907 (2001) (where an employee's lying about posting a wage-related notice was found protected where it failed to relate to the performance of his job or the respondent's business); see also, e.g., *St. Louis Car Co.*, 108 NLRB 1523, 1525–1526 (1954) (where an employee's untruthful denial of her union organizing activity was protected because "it related not to the [r]espondent's 10     business at all, but to personal rights guaranteed by [the Act] which she desired not to disclose"); see also, e.g., *United Services Automobile Assn.*, 340 NLRB 784, 786 (2003), enfd. 387 F.3d 908 (D.C. Cir. 2004) (Board found no obligation for employee to respond truthfully to employer's questioning that lacked a valid purpose).  Thus, the Board has recognized that in certain circumstances, such as those found in the instant case, employees have legitimate interests in 15     shielding their Section 7 activities from an employer's inquiry, even by lying about it.

      Based on the above, I find that the Respondent failed to show that it would have taken the same actions against Stolzenfels and Harrison in the absence of their union and protected concerted activities.  Accordingly, based on the record evidence in this case and the well-20     established Board law discussed above, I find that the Respondent unlawfully discharged Stolzenfels and Harrison based on their union and protected concerted activities, in violation of Section 8(a)(3) and (1) of the Act.

      5.   Whether deferral to the arbitrator's awards is appropriate.

25

      Having found that the Respondent violated the Act by discharging Stolzenfels and Harrison, I must now determine whether it is appropriate to defer to the arbitrator's awards and determinations that the discharges did not violate the collective-bargaining agreement.  For the reasons stated below, I find that deferral to the arbitrator's awards is not appropriate.

30

      It is well established that the Board has considerable discretion in determining whether to defer to the arbitration process when doing so will serve the fundamental aims of the Act. *Wonder Bread*, 343 NLRB 55 (2004), see *Dubo Mfg. Corp.*, 142 NLRB 431 (1963); *Collyer Insulated Wire*, 192 NLRB 837 (1971); and *United Technologies Corp.*, 268 NLRB 557 (1984).  The 35     Board's standard for deferring to arbitral awards is also solely a matter for its discretion, as Section 10(a) of the Act expressly provides that the Board is not precluded from adjudicating unfair labor practice charges even though they might have been the subject of an arbitration proceeding and award. *Babcock & Wilcox Construction Co.*, 361 NLRB No. 132, slip op. at 3 (2014).

40

---

[22] In addition, in *Paragon*, the Board specifically found the facts of *Fresenius* were distinguishable from that case, noting that the dishonesty in *Fresenius* was unprotected because it took place during the "legitimate investigation of facially valid and serious complaints of employee misconduct" (sexual harassment), even though the conduct took place during the employee's union activity.  In contrast however, in *Paragon*, the respondent was aware of the strike notice before questioning Baker and Holland about their role in delivering it.  Id. slip op. at 5, fn. 15.

In *Spielberg Mfg. Co.,* 112 NLRB 1080 (1955), the Board held that it would defer to arbitral decisions in cases in which the proceedings appear to have been fair and regular, all parties agreed to be bound, and the decision of the arbitrator is not clearly repugnant to the purposes and policies of the Act. Id. at 1082.  In *Olin Corp.*, 268 NLRB 573 (1984), the Board
5   held that it would condition deferral on the arbitrator having adequately considered the unfair labor practice issue, which is satisfied if:  the contractual issue is factually parallel to the unfair labor practice issue, and the arbitrator was presented generally with the facts relevant to resolving the unfair labor practice.  Id. at 574.  The Board stated that it will not require an arbitrator's award to be totally consistent with Board precedent, however, deferral will not be
10  found appropriate under the clearly repugnant standard where the arbitration award is "palpably wrong" or "not susceptible to an interpretation consistent with the Act."  Id.  Under *Spielberg*, supra, and *Olin Corp.*, supra, the burden of proof is on the party opposing deferral to the arbitration award.  *Airborne Freight Corp.*, 343 NLRB 580, 581 (2004).

15    In *Babcock & Wilcox Construction Co.*, 361 NLRB No. 132 (2014), the Board recently revisited *Olin* and held that the existing postarbitral deferral standard did not adequately balance the protection of employee rights under the Act and the national policy of encouraging arbitration of disputes concerning the application or interpretation of collective-bargaining agreements.  The Board found that the *Olin* standard created an excessive risk of deferral when
20  an arbitrator had not adequately considered the issue of the unfair labor practice, or when it was simply impossible to determine whether that issue had been considered by the arbitrator.  In *Babcock*, the Board created a new standard for deferring to arbitral decisions in Section 8(a)(3) and (1) cases,[23] finding that postarbitral deferral is appropriate where the arbitration procedures appear to have been fair and regular, the parties agreed to be bound,[24] and the party urging
25  deferral demonstrates that:  (1) the arbitrator was explicitly authorized to decide the unfair labor practice issue; (2) the arbitrator was presented with and considered the statutory issue, or was prevented from doing so by the party opposing deferral; and (3) Board law "reasonably permits" the arbitral award. Id. slip op. at 5–10.  Critically, the Board in *Babcock* announced a significant change in the deferral analysis by placing the burden of proving the substantive requirements for
30  deferral on the party urging deferral. Id. slip op. at 10–11.

On the issue of deferral to the arbitrator's awards in this case, the Respondent would be the party urging deferral to the arbitration determinations that it did not violate the contract by discharging Stolzenfels and Harrison.[25]  The Parties-In-Interest, however, contend in their post-
35  hearing brief that the arbitrator "evaluated the miners' conduct against a standard which conflicts with and contradicts Board law," and the arbitrator "failed to consider Board precedent." (PIN br. at p. 19).  Therefore, the Parties-In-Interest contend that deferral to the awards is not appropriate.

---

[23] The Board also modified the standards for prearbitral deferral and deferral to grievance settlements.

[24] These requirements traditionally set forth under *Spielberg* and *Olin* were not affected by the *Babcock* decision.

[25] In the instant case, the Respondent failed to offer argument at trial or in its post-hearing brief on the issue of deferral, but I find it safe to presume that besides contending that it did not violate the Act by discharging Stolzenfels and Harrison, it likewise would contend that the Board should defer to the arbitrator's determinations that discharges did not violate the collective-bargaining agreement.  In addition, I note that neither the General Counsel nor Charging Party addressed the issue of deferral at the hearing or in their post-hearing briefs.

The first question I am confronted with on this issue is whether to apply the new standard under *Babcock*, or the previous standard under *Olin*. In *Babcock*, the Board indicated that the new postarbital standard for deferral would be applied prospectively ("in future cases") and not
5    retroactively ("in all pending cases"). Id. slip op. at 13–14. Therefore, if the arbitration hearing occurred on or before December 15, 2014 (the date the *Babcock* decision issued), *Olin* applies. However, if the collective-bargaining agreement under which the grievances arose was executed after December 15, 2014, *Babcock* applies.

10    In the instant case, none of the parties sought to introduce the collective-bargaining agreement into evidence,[26] but they did stipulate that the operative collective-bargaining agreement in effect was the National Bituminous Coal Wage Agreement of 2011. (Jt. Exh. 1.) That collective-bargaining agreement was clearly executed before December 15, 2014, and the arbitration hearings were held after December 14, 2014 (on March 20, 2015, for Stolzenfels and
15    April 3, 2015, for Harrison). For situations such as the instant case, where the collective-bargaining agreement was executed on or before December 15, 2014, and the arbitration hearings occurred after December 15, 2014, the applicable standard depends on whether the arbitrator was explicitly authorized to decide the statutory issue (either in the collective-bargaining agreement or by agreement of the parties). Id. slip op. 13–14. If the arbitrator was
20    authorized to do so, the Board held that *Babcock* applies because such cases meet the first prong of *Babcock*, and it is therefore appropriate to apply the remaining criteria of the new standard because it would not contravene the parties' settled expectations. Id. slip op. at 14. If the parties did not authorize the arbitrator to decide the statutory issue, then *Olin* applies. Id.

25    An application of these criteria to the instant case, in which the collective-bargaining agreement was executed before December 15, 2014, and the arbitration hearings were held after December 15, 2014, reveals that deferral is dependent upon evidence whether the arbitrator was explicitly authorized to decide the statutory issues. I find that the record does not contain such evidence, as it is devoid of any evidence that the specific statutory right at issue was incorporated
30    into the collective-bargaining agreement, or that the parties explicitly authorized the arbitrator to decide the statutory issue. Therefore, the deferral analysis under *Olin* is applicable in this case.

As mentioned above, in the *Spielberg/Olin* standard, the Board will defer when the proceedings are fair and regular, all parties agreed to be bound, and the arbitrator's decision is
35    not clearly repugnant to the purposes and policies of the Act. In addition, deferral is appropriate if the arbitrator adequately considered the unfair labor practice issue (the contractual issue is factually parallel to the unfair labor practice or statutory issue), and the arbitrator was presented generally with the facts relevant to resolving the unfair labor practice. *Olin* supra at 574. However, the Board will not find deferral appropriate under the "clearly repugnant" standard
40    where the arbitration award is "palpably wrong" or "not susceptible to an interpretation consistent with the Act." Id.

---

[26] The record contains only pp. 290–293 of the collective-bargaining agreement pertaining to art. XXII, sec. (r) ("Local Union Meeting Place") and sec. (s) (Bonus Plans), and part of art. XXXIII (Settlement of Disputes) (GC Exh. 2).

In this case, the evidence fails to establish that the arbitration proceedings were "fair and regular," or that the parties agreed to be bound by the arbitration.  The parties also did not enter into any stipulations with regard to those factors.  In addition, the arbitrator did not adequately consider the unfair labor practice issues as there is no mention in her awards of the unfair labor practice issues for Stolzenfels and Harrison.  Furthermore, the awards are repugnant to the Act.

On the issue of deferral to an arbitrator's award, the Board noted in *Babcock & Wilcox Construction* that:

An arbitrator applying the 'just cause' provision in the contract—and sustaining the discharge—may well depart from the standards that the NLRB would apply because they are issues of legal characterization, in light of the policies of the NLRA, and are therefore not likely to have been precisely addressed by the arbitrator. *Babcock & Wilcox Construction,* supra at slip op. 8, citing Robert A. Gorman & Matthew W. Finkin, *Basic Text on Labor Law* 1028 (2d ed. 2004).

In cases where arbitrators measure employee conduct against a standard which conflicts with or contradicts Board law, the Board has found such awards repugnant to the Act and has refused to grant them deference.  The Board, in *The Union Fork & Hoe Co.*, 341 NLRB 907 (1979), held that where an arbitrator ruled an employee was discharged for just cause, but failed to consider well-established Board law regarding whether that employee's conduct was protected by the Act, that award was "repugnant to the Act."  In that case, the arbitrator ruled that a union steward was insubordinate (and therefore was properly discharged), and failed to consider well-established Board precedent establishing that stewards are protected by the Act when fulfilling the role of processing grievances.  On that basis, the Board reasoned that the arbitrator measured the steward's conduct against a standard which conflicted with Board law, and the arbitration award was repugnant to the policies and purposes of the Act, and was not entitled to deference. Id. at 907–908.

Even though the Respondent in the instant case would likely argue that the facts presented to the arbitrator were "factually parallel" to the unfair labor practice allegations, the arbitrator considered only whether their discharges violated the collective-bargaining agreement based on the alleged violations of Conduct Rule 4 and their lying about it.  However, as mentioned above, the statutory rights of Stolzenfels and Harrison were clearly not considered by the arbitrator, and she measured their conduct against a standard which conflicts with and contradicts Board law.  In this regard, the arbitration awards fail to show consideration of, or even the mention of, the statutory issues against retaliation for union and/or protected concerted activities, the fact that the employees were engaged in union and protected concerted activities, the fact that the use of profanity in the mine was commonplace, or the fact that Stolzenfels and Harrison were treated disparately from others, both management and employees alike, who used profanity in the mine.  The arbitrator also failed to consider well-established Board precedent holding that activities in support of the Union, the provisions of the collective-bargaining agreement, and employee safety concerns, are protected by Section 7 of the Act.  The arbitrator also failed to consider Board precedent holding that an employee's use of offensive language, standing alone, does not forfeit the protection of the Act unless it is so egregious or threatening that it removes the protection of the Act and renders the employee unfit for further service. *Kiewit Power*, supra at 710.  On that basis, I find that the arbitration awards in this case are

"palpably wrong" and simply not susceptible to an interpretation that is consistent with the Act, and therefore are "clearly repugnant" to the Act.

5   I note that the Board has on other occasions refused to defer to arbitration awards where arbitrators have upheld discipline or discharges for conduct protected by the Act, where such awards were repugnant to the Act. *Babcock & Wilcox Construction*, supra at slip op. 8; See, e.g., *Mobil Oil Exploration & Producing, U.S.*, 325 NLRB 176, 177–179 (1997), enfd. 200 F.3d 230 (5th Cir. 1999) (refusing to defer to arbitrator's decision upholding discipline based on employee's protected concerted activities of complaining that the employer intended to discharge
10  him for his union activities); *Garland Coal & Mining Co.*, 276 NLRB 963, 964–965 (1985) (arbitrator's decision that union president's protected activity in refusing to sign a memo for the safety director which supported the employer's opposition to consolidation of the mine and safety committees, constituted insubordination upholding his suspension (but not discharge), was "repugnant to the Act"); see also *Cone Mills Corp.*, 298 NLRB 661 (1990) (arbitrator's finding
15  that employee's suspension from filing a complaint under the contract was improper, but her refusal to leave the building as instructed constituted insubordination under the just cause doctrine and was sufficient to warrant denial of backpay, was "repugnant to the Act").

20  Based on the record evidence in this case, and the well-established Board law discussed above, I find that the arbitrator's awards for Stolzenfels and Harrison do not satisfy the Board's standard for deferral under *Spielberg/Olin*.   Accordingly, deferral to the awards is not appropriate, and I find that the Respondent discharged Stolzenfels and Harrison for engaging in union and protected concerted activities, in violation of Section 8(a)(3) and (1) of the Act.

25                              CONCLUSIONS OF LAW

1.    The Respondent, Murray American Energy, Inc., and Marion County Coal Company, constitute a single-integrated enterprise and a single employer within the meaning of the Act. The Respondent is an employer engaged in commerce within the meaning of Section 2(2), (6),
30  and (7) of the Act.

2.    The United Mine Workers of America, District 31, Local 9909, AFL–CIO, CLC is a labor organization within the meaning of Section 2(5) of the Act.

35  3.    The Respondent has engaged in unfair labor practices in violation of Section 8(a)(3) and (1) of the Act by discharging employees Jesse Stolzenfels on March 5, 2015, and Richard Harrison on March 15, 2015, because of their engagement in union and protected concerted activities.

40  4.    The above unfair labor practices affect commerce within the meaning of Section 2(6) and (7) of the Act.

                              REMEDY

45  Having found that the Respondent has engaged in certain unfair labor practices, I shall order it to cease and desist therefrom and to take certain affirmative action designed to effectuate the policies of the Act.

The Respondent, having discriminatorily discharged Jesse Stolzenfels and Richard Harrison, shall be ordered to offer them reinstatement to their former positions, or if those jobs no longer exist, to substantially equivalent positions, without prejudice to their seniority or any other rights or privileges previously enjoyed, and to make them whole for any loss of earnings and other benefits they may have suffered as a result of the discrimination against them.  As these violations involve a cessation of employment, backpay shall be computed on a quarterly basis, less any interim earnings, as prescribed in *F. W. Woolworth Co.*, 90 NLRB 289 (1950), with interest at the rate prescribed in *New Horizons*, 283 NLRB 1173 (1987), compounded daily as prescribed in *Kentucky River Medical Center*, 356 NLRB 6 (2010).   Additionally, the Respondent shall be ordered to compensate Stolzenfels and Harrison for any adverse tax consequences of receiving lump-sum backpay awards.  *Don Chavas, LLC d/b/a Tortillas Don Chavas*, 361 NLRB No. 10 (2014).

Additionally, in accordance with the Board's decision in *AdvoServ of New Jersey, Inc.*, 363 NLRB No. 143 (2016), the Respondent shall be ordered, within 21 days of the dates the amounts of backpay are fixed, either by agreement or Board order, to submit and file the appropriate documentation allocating the backpay awards to the appropriate calendar quarters or periods (reports allocating backpay) with the Regional Director.  The Respondent will be required to allocate backpay to the appropriate calendar years only.  The Regional Director will then assume responsibility for transmission of the reports to the Social Security Administration at the appropriate times and in the appropriate manner. Id.

The Respondent shall also be ordered to expunge from its files any and all references to the discriminatory and unlawful discharges of Stolzenfels and Harrison, and notify them in writing that this has been done and that evidence of the discriminatory and unlawful actions will not be used against them in any way.

The General Counsel also seeks an order requiring that the Respondent reimburse Stolzenfels and Harrison for out-of-pocket expenses they may have incurred while searching for work regardless of whether they received interim earnings for a particular quarter.  Discriminatees are entitled to reimbursement for expenses incurred in their search for interim employment.   However, at present, Board law considers such expenses as an offset to a discriminatee's interim earnings, rather than calculating them separately.  *West Texas Utilities Co.*, 109 NLRB 936, 939 fn. 3 (1954).  I am, of course, obligated to follow existing Board precedent in resolving the issues present in this case.  *Pathmark Stores, Inc.*, 342 NLRB 378, 378 fn. 1 (2004); *Waco, Inc.*, 273 NLRB 746, 749 fn. 14 (1984).   Accordingly, I shall deny the General Counsel's request for this additional remedy of expenses incurred while searching for work.

On these findings of fact and conclusions of law, and on the entire record, I issue the following recommended:[27]

---

[27]  If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

ORDER

The Respondent, Murray American Energy, Inc., and the Marion County Coal Company, a single employer, Metz, West Virginia, its officers, agents, and representatives, shall

5

   1.  Cease and desist from

      (a)  Discharging employees for engaging in union and/or protected concerted activities;

10      (b)  In any like or related manner, restraining or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

   2.  Take the following affirmative action necessary to effectuate the policies of the Act.

15      (a)  Within 14 days from the date of this Order, offer Jesse Stolzenfels and Richard Harrison full reinstatement to their former jobs, or if those jobs no longer exists, to substantially equivalent positions, without prejudice to their seniority or any other rights or privileges previously enjoyed.

20      (b)  Make whole Jesse Stolzenfels and Richard Harrison for any loss of earnings and other benefits suffered as a result of their unlawful discharges and discrimination against them, in the manner set forth in the remedy section of this decision.

      (c)  Compensate Jesse Stolzenfels and Richard Harrison for the adverse tax consequences, 25 if any, of receiving a lump-sum backpay awards, and file with the Regional Director for Region 6, within 21 days of the dates the amounts of backpay are fixed, either by agreement or Board order, reports allocating the backpay awards to the appropriate calendar year(s).

30      (d)  Within 14 days from the date of this Order, remove from its files any references to its unlawful discharges of Jesse Stolzenfels and Richard Harrison, and within 3 days thereafter, notify said employees in writing that this has been done and that the discharges will not be used against them in any way.

35      (e)  Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including electronic copies of such records if stored in electronic form, necessary to analyze the amounts 40 of backpay due under the terms of this Order.

      (f)  Within 14 days after service by the Region, post at its facilities in Marion and Monongalia Counties, West Virginia, copies of the attached notice marked

JD–26–16

"Appendix."[28]  Copies of the notice, on forms provided by the Regional Director for Region 6, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted.  In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means.  Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material.  If the Respondent has gone out of business or closed the facilities involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since March 5, 2015.

(g) Within 21 days after service by the Region, file with the Regional Director for Region 6 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

Dated, Washington, D.C.   April 5, 2016

Thomas M. Randazzo
Administrative Law Judge

---

[28]  If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

**APPENDIX**

NOTICE TO EMPLOYEES

Posted by Order of the
National Labor Relations Board
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO:

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

**WE WILL NOT** discharge or otherwise discriminate against you for engaging in protected concerted activities or for your membership in, support of, or activities on behalf of the United Mine Workers of America, District 31, Local 9909, AFL–CIO, CLC or any other labor organization.

**WE WILL NOT** in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights guaranteed you by Section 7 of the Act, which are listed above.

**WE WILL,** within 14 days from the date of the Board's Order, offer Jesse Stolzenfels and Richard Harrison immediate and full reinstatement to their former jobs, or if those jobs no longer exist, to substantially equivalent positions, without prejudice to their seniority or any other rights or privileges previously enjoyed.

**WE WILL** make Jesse Stolzenfels and Richard Harrison whole for any loss of earnings and other benefits resulting from their unlawful discharges, less any net interim earnings, plus interest.

**WE WILL** compensate Jesse Stolzenfels and Richard Harrison for the adverse tax consequences, if any, of receiving lump-sum backpay awards, and **WE WILL** file with the Regional Director for Region 6, within 21 days of the dates the amounts of backpay are fixed, either by agreement or Board order, reports allocating the backpay awards to the appropriate calendar year(s).

**WE WILL**, within 14 days from the date of the Board's Order, remove from our files any references to the unlawful discharges of Jesse Stolzenfels and Richard Harrison, and **WE WILL**, within 3 days thereafter, notify said employees in writing that this has been done and that the discharges will not be used against them in any way.

**MURRAY AMERICAN ENERGY, INC., AND**
**THE MARION COUNTY COAL COMPANY,**
**A SINGLE EMPLOYER**
(Employer)

Dated: _____   By: _____
                                            (Representative)                (Title)

The National Labor Relations Board is an independent Federal agency created in 1935 to enforce the National Labor Relations Act. It conducts secret-ballot elections to determine whether employees want union representation and it investigates and remedies unfair labor practices by employers and unions. To find out more about your rights under the Act and how to file a charge or election petition, you may speak confidentially to any agent with the Board's Regional Office set forth below or you may call the Board's toll-free number 1-866-667-NLRB (1-866-667-6572). Hearing impaired persons may contact the Agency's TTY service at 1-866-315-NLRB. You may also obtain information from the Board's website: www.nlrb.gov.

William S. Moorhead Federal Building
1000 Liberty Avenue, Room 904
Pittsburgh, PA  15222-4111
(412) 395-4400
Hours: 8:30 a.m. to 5:00 p.m. ET

The Administrative Law Judge's decision can be found at www.nlrb.gov/case/06-CA-148388 or by using the QR code below.  Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.



**THIS IS AN OFFICIAL NOTICE AND MUST NOT BE DEFACED BY ANYONE**

THIS NOTICE MUST REMAIN POSTED FOR 60 CONSECUTIVE DAYS FROM THE DATE OF POSTING AND MUST NOT BE ALTERED, DEFACED, OR COVERED BY ANY OTHER MATERIAL. ANY QUESTIONS CONCERNING THIS NOTICE OR COMPLIANCE WITH ITS PROVISIONS MAY BE DIRECTED TO THE ABOVE REGIONAL OFFICE'S COMPLIANCE OFFICER, (412) 395-4400.
