IN THE CIRCUIT COURT OF MARSHALL COUNTY, WEST VIRGINIA

THE MARSHALL COUNTY COAL COMPANY,
THE MARION COUNTY COAL COMPANY,
THE MONONGALIA COUNTY COAL COMPANY,
THE HARRISON COUNTY COAL COMPANY,
THE OHIO COUNTY COAL COMPANY,
MURRAY ENERGY CORPORATION, and
ROBERT E. MURRAY,

        Plaintiffs,

v.

JOHN OLIVER, CHARLES WILSON,
PARTIALLY IMPORTANT PRODUCTIONS, LLC,
HOME BOX OFFICE, INC., TIME WARNER, INC.,
and DOES 1 through 10,

        Defendants.

Civil Action No. 17-C-124
Judge Jeffrey Cramer

### MEMORANDUM OF LAW IN SUPPORT OF
### PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND
### PRELIMINARY INJUNCTION

The above-captioned Plaintiffs hereby submit this *Memorandum of Law in Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction* and, for the reasons set forth herein, respectfully request that this Court enter a temporary restraining order, preliminary injunction, and "gag order" to restrain Defendants, during the pendency of this litigation, from (i) re-broadcasting the Defamatory Statements that are the subject of Plaintiffs' Complaint,[1] and (ii) publicly discussing the substance of this litigation. This relief is necessary to prevent further irreparable harm to Plaintiffs and their employees, and to preserve Plaintiffs' ability to obtain justice from a jury of impartial peers in this Court. The relevant facts and authorities are set forth below. Due to the imminent and irreparable injury, loss, and damage that the Motion seeks to prevent, Plaintiffs respectfully request an expedited hearing on the Motion.

---

[1]     Capitalized terms used but not defined herein are defined in the Complaint.

## PRELIMINARY STATEMENT

Plaintiffs are quickly learning firsthand about the phenomenon that Time and Fortune magazines have dubbed the "John Oliver Effect."   When Plaintiffs filed their Complaint, they did not appreciate the extent of the destructive aftermath that Defendants' malicious and false broadcast would cause. Mr. Murray and his employees and family have been inundated with an onslaught of threats, harassment, and intimidation by people that are simply following Defendants' lead as they view and re-view the Defamatory Statements.   Murray Energy's website has been overrun with messages of "Eat Shit, Bob."   Employees who once enjoyed coming to work now spend their days receiving countless phone calls and e-mails telling them they are "a worthless piece of shit," and worse. Mr. Murray's family members have even received death threats.  None of this would have occurred but for Defendants' broadcast of the Defamatory Statements.  Worse yet, Defendants knew that fans of the show would react in this manner.  Continued publication and public access to the Defamatory Statements will only enlist additional people to Defendants' perverse "call to action," with additional grave consequences.

Moreover, the John Oliver Effect has already spilled over to directly affect this litigation: numerous media outlets are commenting on their views of this action in a biased fashion that often times provides viewers with access to the entire June 18 broadcast.  Additionally, the broadcast's YouTube video has been viewed 1.9 million times more since the Complaint was filed.  The pervasiveness of the Defamatory Statements is unfairly tilting public opinion in Defendants' favor so much so that third parties have specifically directed threats and harassment at Plaintiffs' counsel regarding the perceived merits of Plaintiffs' claims.  Plaintiffs' ability to assemble a fair and impartial jury diminishes every day that the Defamatory Statements are available to prejudice the individuals that might be called upon to serve justice in this matter.

2

Plaintiffs therefore seek narrow relief to protect the wellbeing and property of those affected by this lawsuit and the potential pool of West Virginian jurors. Seeking Court intervention in this manner comes as a last resort following Plaintiffs' request for a voluntary agreement from Defendants, which defense counsel refused, notwithstanding Defendants' awareness of these facts and, significantly, Mr. Murray's serious health condition and the harassment resulting from the show that is specified in the Complaint.

To prevent further imminent and irreparable harm, Plaintiffs request an Order enjoining the rebroadcast of the program at issue in this litigation and prohibiting Defendants from using their unique powers, through their access to millions of West Virginians, to bias the potential jurors who will determine their fate. Plaintiffs' request for limited relief will mitigate further irreparable injury to Mr. Murray and his companies, as well as protect untold numbers of innocent Murray Energy employees from the consequences of the John Oliver Effect. Plaintiffs also believe fairness dictates reciprocity, and will similarly be bound to refrain from utilizing the press, which they have attempted to modestly employ in a futile endeavor to level the disproportionate media playing field that Defendants enjoy.

## FACTS

### I.   Defendants' Assault on Mr. Murray and his Companies.

On June 18, 2017, before HBO's approximately 134 million subscribers, Defendants executed a meticulously planned attempt to assassinate the character and reputation of Mr. Robert E. Murray and his companies, including Murray Energy Corporation and those in West Virginia, on a world stage. In carrying out their attack on Mr. Murray and his companies, however, Defendants ignored facts in their possession that directly contradicted the false and defamatory statements about Mr. Murray and his companies that they improperly passed off as truths to the nation and throughout the world.

When Defendants made Mr. Murray and the other Plaintiffs aware that they intended to advance their anti-coal agenda by, among other things, broadcasting injurious, false, and defamatory statements to millions of people, Mr. Murray and the other Plaintiffs, at Defendants' invitation (believed to have been extended under the guise of responsible and ethical journalism), transmitted—prior to the June 18, 2017 broadcast—information and facts directly contrary to the injurious, false, and defamatory statements that Defendants threatened to broadcast.  But instead of reporting on the facts, including those facts which Defendants secured through their (what turned out to be) disingenuous outreach to Mr. Murray and his companies, Defendants ignored them and "doubled-down" on their character assassination of Mr. Murray and the business reputation of his companies, ending their recorded broadcast with the phrases "Eat Shit, Bob" and "Kiss my ass, Bob."

Defendants' initial broadcast of the Defamatory Statements has subsequently been viewed over 6.1 million times on YouTube (an increase of 1.9 million since Plaintiffs filed their Complaint), over 1.5 million times on Facebook (with over 32,000 likes) (an increase of 300,000 and 3,000, respectively, since the Complaint was filed), and an unknown number of additional times by people who have viewed the broadcast on streaming applications.  The number of people who have viewed the Defamatory Statements will only continue to rise throughout this litigation.

II.  **The "John Oliver Effect": Defendants' Audience Joins in the Assault on Mr. Murray and his Companies.**

Defendants have broadcasted the show "Last Week Tonight with John Oliver" since April 27, 2014.  In that time, the show has developed a loyal fan base, averaging millions of viewers each week.  Defendants regularly take advantage of that fact to advance their agendas.

As has been the subject of wide-spread reports, including by Time and Fortune magazines, Defendants incite viewers of Defendant Oliver's show to attack, harass, and injure the show's subjects. Known as "The John Oliver Effect," Defendants are well aware of the injury the show's fans inflict upon Mr. Oliver's targets, and they encourage it. As reported by Fortune magazine:

> With his signature humor, Oliver convinces his audience that they should care about these complex topics and often signs off with a call to action. The result is what *Time* has called the "John Oliver Effect," in which the British comedian helps—in ways both big and small—to create very real change. This level of influence is what landed Oliver, who in addition to the show's host is also an executive producer, on Fortune's 2015 40 Under 40 list.

Beth Kowltt, *The John Oliver Effect: Why the British Comedian's Impact is no Joke*, Fortune.com (Sept. 29, 2015).

Time magazine similarly recounted how Defendants incite vigilantism. Time's article reported how Defendant Oliver called upon his viewers to inflict damage upon governmental property: "'seize your moment, my lovely trolls,' he said. 'Turn on caps lock, and fly, my pretties!' He got his wish. Following the show, a flood of new comments led to major glitches for the FCC website." *See* Victor Luckerson, *How the 'John Oliver Effect' is Having Real-Life Impact*, Time Magazine (Jan. 20, 2015) (Updated July 10, 2015).

Other instances of the John Oliver Effect causing significant damage have been reported. In 2015, Defendants aired a segment discussing alleged exploitation of chicken farmers by chicken production companies. Defendant Oliver criticized members of the House Appropriations Committee, who declined to pass a bill that, in his view, would have protected the farmers. Defendant Oliver then encouraged viewers to harass congresspersons by editing their Wikipedia pages to label them as "chicken f***ers." According to one source, at least

thirty-six Wikipedia articles were vandalized. *See* https://blog.wikimedia.org/2015/05/27/dark-side-of-comedy/.

Plaintiffs have similarly experienced the John Oliver Effect, to disturbing and dangerous proportions. In the days following the June 18, 2017 broadcast of Last Week Tonight with John Oliver, in which the Defamatory Statements were first broadcast to millions of viewers, Murray Energy's website twice received over 30,000 spam messages within a 20-minute window in an effort to "crash" the site. *See Affidavit of John Klayko* (the "Klayko Aff.") ¶ 5. A third, potentially more damaging attack, received from multiple sources, forced Murray Energy to take its website down on the morning of June 20, 2017, to implement new, increased security measures. Threats of physical harm and property damage have only increased since the Complaint was filed. *Id.* ¶ 10.

Plaintiffs also have been continuously harassed by numerous telephone calls that have subjected Plaintiffs' employees to threats and vulgarities and tied up Plaintiffs' telephone lines, preventing timely communications with Plaintiffs' customers and vendors. Klayko Aff. ¶ 8; *Affidavit of Heather Santini* (the "Santini Aff.") ¶ 4. These attacks caught Plaintiffs' innocent employees in the crossfire—employees who, by any measure of descent humanity, should not be subject to the vulgarities asserted by Defendants' viewership. Some of the harassing calls incited by the Defamatory Statements can be summarized as follows:

- Multiple callers exclaiming "Tell Bob Murray to eat shit!" or "Eat shit, Bob!";

- One caller stating that "your owner is a pussy and he's fat!";

- Another caller asked an employee if she liked working for a company that was destroying the planet;

- One stated that "Murray Energy is a lying piece of shit";

- One person congratulated Mr. Murray on being probably one of the most heartless people alive to watch so many of his employees die;

- A group called on speaker phone demanding Plaintiffs' employee to "justify to the whole room why you like working at Murray Energy" and then demanded that she repeat her positive answer "to all the miners, that Bob Murray took all the black lung insurance from";

- One stated his desire to "tell Bob Murray to eat shit and kiss my ass!";

- One condemned an employee, explaining that "you should be ashamed of yourself for working for a company like Murray Energy"

- Multiple callers asked "Is Dr. Evil in?";

- One stated "you're a worthless piece of shit"

- Others demanded that Plaintiffs "stop with their bullshit lawsuits" or asked "Why are you suing John Oliver?"

- One threatened employees "to watch their back";

- One stated "hope your CEO goes to Hell";

- One explained "this is a squirrel, F@@@ you Bob, F@@@ you Bob!";

- Another called a receptionist "a F@@@ing Bitch," among other derogatory terms.

Santini Aff. ¶ 4.

If the foregoing were not enough, employees are also in fear from hearing that Mr. Murray's son, who is not a party to this action, received a phone call on his mobile phone from a caller that wished him death. Santini Aff. ¶ 7. These telephone calls represent a fraction of what Plaintiffs have endured since the initial broadcast, which only intensified after Plaintiffs commenced this action to vindicate the wrongs they have suffered, including demands to "Drop the lawsuit." *Id.* ¶ 5.

Plaintiffs' emails servers have also been subjected to malicious attacks and harassing communications since the June 18 broadcast of "Last Week Tonight with John Oliver," and increasingly following the commencement of this action. Klayko Aff. ¶¶ 5, 7. In addition to the attempts to crash Murray Energy's website described above and in the Complaint, Plaintiffs have

received numerous disparaging e-mails echoing Defendant Oliver's comments on the show.  The following emails are examples of the John Oliver Effect:

From: Chris McNair <mcnair.chris@gmail.com>
Date: June 22, 2017 at 9:18:57 PM EDT
To: rmurray@coalsource.com
Subject: RE: Coal News Mag

Eat SH)T Bob!

From: kmart1131 <kmart1131@yahoo.com>
Date: June 22, 2017 at 6:36:21 PM EDT
To: sales@coalsource.com
Subject: EAT SHIT BOB!!!

From: Mike Waite <waitemw@yahoo.com>
Date: June 22, 2017 at 5:12:08 PM EDT
To: "sales@coalsource.com" <sales@coalsource.com>
Subject: EAT SHIT BOB!
Reply-To: Mike Waite <waitemw@yahoo.com>

You fucking slime ball!

From: Chris Ryan <Chris@Chris-Ryan.com>
Date: June 22, 2017 at 7:44:55 PM EDT
To: media@coalsource.com
Subject: Eat shit bob!

From: Bruno Seabra <brunoseabra@gmail.com>
Date: June 19, 2017 at 10:59:01 PM EDT
To: rmurray@coalsource.com
Subject: EAT SHIT BOB!

From: Christopher Campbell <campbell_chris@mc.com>
Date: June 22, 2017 at 7:47:24 PM EDT
To: media@coalsource.com
Subject: Eat Shit, Bob. You fat cunt.

*Id.* ¶ 7.

The John Oliver Effect is also pervasive on social media.  For example, Mr. Murray been inundated with harassing messages on Murray Energy's Facebook website in the wake of the June 18 broadcast.  Santini Aff. ¶ 8.  Among other comments, Facebook users have left messages saying:

- "Criminal"

- "Clown"

- "Should be imprisoned"

- "Thief"

- "Liar"

- "This man should not be operating mines of any kind"

- "Scum"

- "He's murdering people"

- "Pig"

- "Greedy"

- "Avaricious"

- "Soul less"

- "Corporate hack"

- "A sleaze"

- "Clueless"

- "All Murray wants is money"

- "Rich greedy a\*\*hole"

- "Despot"

- "Puts his Employees in direct danger"

- "Uses illegal mining practices"

- "Is responsible for coal miner's deaths!"

- "POS"

- "ordered ' Retreat Mining ' to extract the most profit from the Crandall mine against OSHA Regulations."

*Id.* The Facebook messages also referred to Murray Energy and stated:

- "Companies who don't give a plug nickel about the employees"

- "The Utah mine that that pulled down the mountain on top of the workers killing them and then 3 more trying to rescue them"

- "Is responsible for coal miner's deaths!"

*Id.* ¶ 9.

Comments posted on other social media such as YouTube and Twitter reflect a similar level of vitriol, include wishes of death to Mr. Murray. In some cases, the comments are eerily prescient regarding the John Oliver Effect, as in the case of YouTube commenters predicting that Murray Energy's website would crash as it did:



Hee Sing Sia 8 days ago
If bob really does sue John Oliver, they can kiss their servers goodbye as they will crash everyday
Reply 24



jasonlalaiaie 6 days ago
The Murry Energy Corp website is crashed now. Well done internet! I wanted to send an "Eat Shit Bob."
email to them but apparently I'm too late.
Reply 39

Santini Aff. ¶ 10.

As these comments reflect, the John Oliver Effect on Plaintiffs goes far beyond incessant and demeaning communications that Plaintiffs and their employees have had to suffer through. Given the relentless attacks that Defendants have encouraged, including on Plaintiffs' website, telephones, and emails systems, and the attendant diversion of IT personnel to respond to these attacks, Plaintiffs have a grave concern that individuals might attempt to infiltrate or harm Murray Energy's electronic network of safety systems. Klayko Aff. ¶ 10. Any interruption to these networks is a risk to human life. *Id.* Murray Energy hosts sensitive computer networks responsible for monitoring all critical safety aspects relating to underground mine conditions. *Id.* These systems monitor, among other things, the quality and composition of breathable air,

seismic events, and all other critical aspects that ensure the complete safety of all underground personnel. *Id.* A security breach of this network literally is a threat to human life itself.[2]

Given the significant diversion of resources that Plaintiff has implemented to deal with this onslaught, Plaintiffs' business has suffered, and continues to irreparably suffer. Plaintiffs' entire telephone system had to be taken offline and upgraded. Klayko Aff. ¶ 8. Many of Plaintiffs' employees cannot perform their usual job functions because they are needed to manage this harassment. *Id.* ¶ 9. Plaintiffs are unable to fully and timely respond to customer inquiries and needs. *Id.* Technology personnel have diverted from attending their normal job functions to concentrate on the issues caused by Defendants. *Id.* Plaintiffs are simply unable to conduct their day-to-day business operations and communications with vendors, suppliers, customers, and others in the same fashion as they did before the Defamatory Statements were publicized.

Defendants' Defamatory Statements have also directly and negatively impacted Plaintiffs' business reputation amongst prospective employees. Santini Aff. ¶ 6. After the filing of the Complaint, when one prospective employee telephoned Murray Energy about being unable to view current job postings on the company's website, a company employee responded that the company website was temporarily down and explained the cause. *Id.* That individual responded that he did not want to work for a company under those circumstances. *Id.*

The John Oliver Effect is not limited to Plaintiffs. Defendants' fan base has attacked Plaintiffs' counsel's electronic media and sent emails such as the following:

---

[2]    This point is especially troublesome in light of the fact that Defendants' broadcast gave its viewers the false impression that Plaintiffs have little regard for the safety of the lives of their employees.

**From:** Sujan Vasavada [mailto:suj1981@gmail.com]
**Sent:** Thursday, June 22, 2017 11:01 AM
**To:** contact@wewillfightforu.com
**Subject:** Fuck Bob Murray and your frivolous lawsuit

Awww poor fat fuckin scumbag Bob Murray had his feelings hurt. He loves America (not sure how that advances a defamation claim). BTW- the fact that in your words the John Oliver segment "likely further reducing his already limited life expectancy due to his Idiopathic Pulmonary Fibrosis," is a wonderful thing. Your client is a scumbag and you are pathetic bottom feeders for filing such a bullshit lawsuit.

Fuck you and your bigoted worthless state. Enjoy the black lung and I can't wait to see your worthless residents lose their opioid treatment when they lose their Medicaid. These "white working class" assholes did it to themselves.

Disrespectfully yours!!!
SV

In sum, the damage caused by the Defamatory Statements goes far beyond what Plaintiffs understood even five days ago. If left unchecked, the John Oliver Effect will continue to irreparably harm Plaintiffs' business and reputations, and jeopardize the wellbeing of Plaintiffs, their employees, and family members.

**III.    Numerous Reports of this Lawsuit Contain Clips of the June 18 Broadcast.**

The John Oliver Effect on Plaintiffs and this lawsuit is being aggravated every day. Since the filing of the Complaint, numerous media outlets, including several under Defendant Time Warner's control, have aired reports of this lawsuit. These reports contain clips of the Defamatory Statements and, in some instances, access to the entire June 18 broadcast of "Last Week Tonight with John Oliver." These reports also comment on this litigation in a way that is damaging to Plaintiffs and likely to bias potential jurors. Media coverage of this lawsuit includes (but is not limited to) the following:

- CNNMoney.com (owned by Defendant Time Warner) posted an article on June 22, 2017 titled "John Oliver Sued by Coal CEO Claiming 'Character Assassination,' which discusses the lawsuit and includes a video re-broadcasting certain of the Defamatory Statements. *See* http://money.cnn.com/2017/06/22/media/john-oliver-coal-king-murray-lawsuit/index.html.

- Salon.com ran an article on June 22, 2017, titled "Power-mad Coal King Sues John Oliver for Defamation, as Promised," in which the author tells readers, among other things, that "[c]ritics, experts and miners alike have blamed Murray Energy for the collapse and what they saw was a flawed emergency response to it, citing possible safety violations." *See* http://www.salon.com/2017/06/22/john-oliver-last-week-tonight-coal-robert-murray-lawsuit/.

- The Washington Post ran an article on June 22, 2017, titled "John Oliver, a Giant Squirrel and a Defamation Lawsuit by a Coal Industry Titan," that includes a video of the Defamatory Statements. *See* https://www.washingtonpost.com/news/morning-mix/wp/2017/06/22/john-oliver-a-giant-squirrel-and-a-defamation-lawsuit-by-a-coal-industry-titan/?tid=ss_ mail&utm_term=.157dc086d856.

- Slate.com ran an article on June 22, 2017, titled "A Coal Baron is Suing John Oliver for 'Character Assassination' over *Last Week Tonight*'s Talking Squirrel Segment," which article, among other things, mocks this lawsuit by contending that Plaintiffs might name the fictitious squirrel that appeared on the original broadcast as a potential defendant. *See* http://www.slate.com/blogs/browbeat/2017/06/22/coal_baron_robert_murray_is_suing_john_oliver_over_his_segment_featuring.html.

- The Daily Beast ran an article on June 22, 2017, titled "Republican Coal King Sues HBO over John Oliver's Show," in which it features a statement by an attorney describing this lawsuit as "frivolous and vexatious." *See* http://www.thedailybeast.com/coal-king-sues-hbo-over-john-olivers-show?source=email&via=desktop.

- CBS News ran an article on June 22, 2017, titled "Coal King Sues John Oliver over 'Last Week Tonight' Segment," which includes a 24-minute video of the entire June 18 broadcast of "Last Week Tonight." *See* http://www.cbsnews.com/news/coal-king-sues-john-oliver-over-last-week-tonight-segment/.

- Time.com (also owned by Defendant Time Warner) ran an article on June 23, 2017 titled "Coal Boss Robert Murray is suing John Oliver after being Mocked on *Last Week Tonight*," which includes a 24-minute video of the entire June 18 broadcast of "Last Week Tonight." *See* http://time.com/4829720/john-oliver-lawsuit-robert-murray-coal/.

- ABC World News Now aired a segment on June 23, 2017, in which it rebroadcast certain of the Defamatory Statements, discussed the merits of Plaintiffs' claims, and commented further on Mr. Murray and the topics of this lawsuit. *See* http://abcnews.go.com/WNN/video/john-oliver-sued-48231110.

IV.    **Defendants' Assault Is Jeopardizing Mr. Murray's Health.**

As a result of the constant rebroadcasting of the Defamatory Statements and the hateful conduct described above, Mr. Murray has suffered and will continue to suffer irreparable injury to his health so long as he and his companies are under attack. As explained in the Complaint, Mr. Murray suffers from Idiopathic Pulmonary Fibrosis, a progressive fatal disease requiring intense medical care, a potential lung transplant, and continuous oxygen. *Affidavit of Robert E. Murray* (the "Murray Aff.") ¶¶ 2-3. Even before the June 18 broadcast, Mr. Murray was told by his doctors that he was in ill health, which would that undoubtedly be made worse as a result of the stress induced by Defendants' conduct. *Id.* ¶¶ 2- 3.

The additional severe distress due to the malicious and defamatory conduct of Defendants and the ensuing barrage from their viewers (a reasonable and foreseeable consequence of the John Oliver Effect) has caused Mr. Murray's emotional and physical health to significantly worsen. Murray Aff. ¶¶ 4-5. As a result of the broadcast and his need to respond to the continued and sustained harassment caused by re-broadcastings, Mr. Murray has increased trouble breathing. *Id.* ¶ 7. He continues to use an oxygen tank full-time and must now reduce meeting lengths to lie down and rest. *Id.* ¶ 8. Mr. Murray must maintain his portable oxygen system set at 6.5 liters per minute, higher than settings before the broadcasts. *Id.* ¶ 7. Even on his recent appearance on a Fox Business segment, he needed his oxygen close by, inhaling from the machine until shortly before airing. *Id.* These events, which continue to haunt Mr. Murray, have been so exhausting that he can barely walk by the end of the day. Mr. Murray lives in fear for his physical safety, and has increased security presence as a result. *Id.* ¶ 6.

## RELIEF REQUESTED

By this Motion, Plaintiffs respectfully request that the Court enter an order immediately restraining Defendants, during the pendency of this litigation, from (i) re-broadcasting the

Defamatory Statements that are the subject of Plaintiffs' Complaint, and (ii) publicly discussing the substance of this litigation. This relief is necessary to prevent further irreparable harm to Plaintiffs and their employees as discussed above, including the erosion of Plaintiffs' business reputation with customers, suppliers, employees, prospective employees, vendors, and the public in general, and to preserve Plaintiffs' ability to obtain justice from a jury of impartial peers in this Court.

## ARGUMENT

I.   **Plaintiffs Are Entitled to a Temporary Restraining Order and Preliminary Injunction.**

Rule 65 of the West Virginia Rules of Civil Procedure governs the issuance of temporary restraining orders and injunctions. *Camden-Clark Mem'l Hosp. Corp. v. Turner*, 575 S.E.2d 362, 367 (W. Va. 2002). Determining whether to grant injunctive relief "calls for the exercise of sound judicial discretion in view of all the circumstances of the particular case." *Jefferson Cty. Bd. of Educ. v. Jefferson Cty. Educ. Ass'n*, 393 S.E.2d 653, 662 (W. Va. 1990). In particular, the Court should consider "the nature of the controversy, the object for which the injunction is being sought, and the comparative hardship or convenience to the respective parties." *Id.*

In exercising its judicial discretion, this Court should consider the "flexible interplay" of four factors: (1) the likelihood of irreparable harm to Mr. Murray, Murray Energy, and his employees and family members without the injunction; (2) the likelihood of harm to Defendants with an injunction; (3) the likelihood that Plaintiffs will succeed on the merits; and (4) the public interest. *Camden-Clark Mem'l Hosp.*, 575 S.E.2d at 366; *see also W. Va. Min. & Reclamation Ass'n v. Snyder*, 1991 WL 331482, at *5 (N.D.W. Va. Aug. 30, 1991) (explaining that court must first balance "the likelihood of irreparable harm to the plaintiff without an injunction against the likelihood of harm to the defendant with an injunction").

15

and irreparable injury, loss, and damage that this Motion seeks to prevent, Plaintiffs respectfully

request an expedited hearing on the Motion.

     WHEREFORE, Plaintiffs respectfully request that the Court enter an order granting the

Motion and such other relief as may be just and proper.


Dated: June 28, 2017

                           Respectfully submitted,


                           Of Counsel for Plaintiffs

Jeffrey A. Grove, Esq. (#6065)
David L. Delk, Jr., Esq. (#6883)
GROVE, HOLMSTRAND & DELK, PLLC
44 1/2 15th Street
Wheeling, WV 26003
(304) 905-1961
(304) 905-8628 (facsimile)

All four of these factors weigh in favor of granting injunctive relief so as to stem the tide of harassment and injury caused by Defendants' malicious conduct. Moreover, the law of West Virginia is clear that "if a decided imbalance of hardship appears in the plaintiff's favor, the plaintiff need not show a likelihood of success; plaintiff need only show that grave or serious questions are presented by plaintiff's claim." *Snyder*, 1991 WL 331482, at *5. Under the circumstances, and as discussed in more detail below, an injunction is necessary and appropriate.

A.   Plaintiffs' Reputations and Mr. Murray's Health are Being Irreparably Harmed, and Will Continue to be Damaged Without an Injunction.

"[I]rreparable harm is often suffered when 'the injury can[not] be adequately atoned for in money,' or when 'the district court cannot remedy [the injury] following a final determination on the merits.'" *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) (quoting *A.O. Smith Corp. v. FTC*, 530 F.2d 515, 525 (3d Cir. 1976)).

Damages to reputation and health are the quintessential forms of irreparable injury that justify injunctive relief, and Plaintiffs are suffering both. With respect to reputational damage, numerous courts have held that

> [e]vidence of potential damage to a business reputation is a sufficient basis to establish irreparable injury justifying the grant of preliminary injunctive relief. Damage to business reputation and good will can be difficult or impossible to quantify and demonstrates irreparable harm, as opposed to injury that can be compensated with damages.

*Jacon H. Rottkamp & Son v. Wulforts Farms*, 17 Misc. 3d 382, 388 (N.Y. Sup. Ct. 2007) (citations omitted); *see, e.g.*, *Registercom v. Verio* 356 F.3d 393, 404 (2d Cir. 2004) ("In our view, the district court did not abuse its discretion in finding that, unless specific relief were granted, Verio's actions would cause Register irreparable harm through loss of reputation, good will, and business opportunities."); *Rodriguez v. National Freight*, 5 F. Supp. 3d 725, 730 (M.D. Pa. 2014) (granting preliminary injunction because "[g]rounds for irreparable injury include loss

of control of reputation"); *Ali v. Playgirl, Inc.*, 447 F. Supp. 723 (S.D.N.Y. 1978) (granting preliminary injunction restraining defendant from circulating magazines containing plaintiff's likeness because unsanctioned use of his image would likely inflict irreparable damage upon plaintiff's reputation); *see also Celsis In Vitro v. CellzDirect*, 664 F.3d 922, 930 (Fed. Cir. 2012) (stating that "valid grounds for finding irreparable harm" include "damage to reputation"); *Mercy Health Servs. v. 1199 Health & Human Serv. Employees Union*, 888 F. Supp. 828 (W.D. Mich. 1995) (enjoining republication of commercials that were unfairly damaging to the reputation of a hospital chain).

For this reason, West Virginia courts have previously enjoined conduct, similar to the conduct here, that harms Plaintiffs' business reputation and terrorizes and intimidates Plaintiffs' employees and family members. *See Parker Paint & Wall Paper Co. v. Local Union No. 813*, 105 S.E. 911 (1921). In *Parker*, a West Virginia court enjoined defendant union members from picketing plaintiff's business because the effect was to tortiously discourage third parties from doing business with plaintiff and to encourage existing customers to breach their contracts. The boycotts were also likely to cause "physical fear" to plaintiff and its employees. *Id.* at 915.

Additionally, as the West Virginia Supreme Court of Appeals stated more than a century ago, "[a]ll injury to health is special and irreparable damages, which will justify the interference of equity." *Medford v. Levy*, 8 S.E. 302, 308 (1888). This commonsense principal has been repeated by courts in West Virginia and elsewhere for years. *See, e.g., In re W. Va. Rezulin Litig.*, 585 S.E.2d 52, 70-71 (2003) (recognizing that "the exposure creating the need for [medical surveillance] was the very essence of irreparable harm" (citing *Barth v. Firestone Tire and Rubber Co.*, 661 F. Supp. 193, 203-05 (N.D. Cal. 1987))); *LaForest v. Former Clean Air Holding Co., Inc.*, 376 F.3d 48 (2d Cir. 2004) (holding that even a mere reduction in medical

coverage benefits established "irreparable injury" warranting injunctive relief); *Kekis v. Blue Cross & Blue Shield of Utica Watertown*, 815 F. Supp. 571 (N.D.N.Y. 1993) ("If Ms. Kekis proves that the absence of injunctive relief would deprive her of valuable medical treatment, then she has shown that she would suffer irreparable harm....[I]nasmuch as this deprivation would permanently affect her health (although the extent of this effect is unknown), it is not the type of deprivation that could be compensated with monetary relief in the future.").

And indeed, pulmonary fibrosis has been specifically recognized to be an ailment that can warrant injunctive relief, including under less aggravating circumstances than those found here. *See 2 Perlman Drive, LLC v. Stevens*, 2017 N.Y. Slip. Op. 50173(U), (N.Y. Civ. Ct. Feb. 9, 2017) (enjoining landlord from employment of chemical exterminators in apartment tenanted by sufferer from pulmonary fibrosis).

As noted in detail above, Defendants' conduct is harming Plaintiffs' reputation and business opportunities, causing Plaintiffs' employees and family members to suffer threatening and harassing confrontations with strangers, and is significantly and unnecessarily exacerbating Mr. Murray's health problems. Prospective employees have declined to pursue employment because of the after effects of the June 18 broadcast. Mr. Murray's son has received death threats. Murray Energy's technology systems, which enable Murray Energy to effectively work with vendors and customers while also monitoring various aspects of underground mining operations that are critical to worker safety, are under attack. The stress of all of this has understandably worsened Mr. Murray's already poor health condition.

Moreover, the continued publication of the Defamatory Statements will impair Plaintiffs' ability to seek redress in this Court. Impaneling an impartial jury will become increasingly difficult, if not impossible, as more and more people are exposed to the Defamatory Statements

and develop prejudices against Plaintiffs similar to the prejudices reflected in the thousands of harassing telephone calls, e-mails, and social media posts described above.

The severity of the harm occasioned by Defendants' conduct cannot be understated, and will certainly worsen so long as new people are being exposed to Defendants' statements. This Court has the power to prevent this harm, and Plaintiffs submit that the circumstances are ripe for equitable intervention.

B.   Defendants Will Not Suffer Harm.

By sharp contrast to the harm Plaintiffs are suffering and will continue to suffer without an injunction, Defendants will suffer no harm from the relief requested by this Motion. Defendants have already aired their false statements regarding Mr. Murray and his companies; further republication of those statements could only be intended to harass and injure Plaintiffs further and incite others to do the same, a purpose that is deserving of no protection by this Court. *See, e.g., Rodriguez*, 5 F. Supp. 3d at 730 ("Because his proposed communications are not intended for a proper purpose, prohibiting such communications will not significantly harm Plaintiff."); *Bingham v. Struve*, 591 N.Y. S.2d 156, 158-59 (N.Y. App. Div. 1992) (granting preliminary injunction against continued speech damaging to plaintiff's "reputation" in "all aspects of his personal and professional life," and rejecting defendant's "attempt to continue her offending communications 'as protected free speech'" because the First Amendment "'does not confer an absolute right to speak or publish, without responsibility, whatever one may choose'"); *see also San Antonio Cmty. Hosp. v. S. Cal. Dist. Council of Carpenters*, 125 F.3d 1230 (9th Cir. 1997) (upholding an injunction against labor union members' use of fraudulent statements on a banner used to boycott their employer; the banner conveyed a misleading and fraudulent impression to third parties and fraud is not entitled to protection under the First Amendment).

19

Additionally, Defendants will suffer no harm from a prohibition of public discussion of this litigation, because Defendant Oliver has already publicly announced that he will refrain from using his show to discuss this case. Although Defendant Oliver made this announcement during the June 25, 2017 episode of "Last Week Tonight with John Oliver," his agreement is inconsistent with his counsel's refusal to agree to a gag order previously. Thus Defendants admit they will incur no harm, but have not formally agreed to the relief requested herein.

C.   <u>Plaintiffs Are Likely to Succeed on the Merits of their Claims.</u>

Finally, although the Court need not reach this prong in light of the severity of the harm Plaintiffs are suffering, *see Snyder*, 1991 WL 331482, at *5, Plaintiffs are likely to succeed on the merits of the defamation, invasion of privacy, and intentional infliction of emotional distress claims against Defendants.

As set forth in the Complaint, Defendants have intentionally published false and outrageous statements about Mr. Murray and his companies. They have contended that Mr. Murray lied about the cause of a tragic mine collapse that took nine lives, and that Mr. Murray is "on the side of black lung." These statements and the other Defamatory Statements set forth in the Complaint maliciously cast Plaintiffs in a false light in front of the public, including the thousands of employees and business partners that they work with in West Virginia, and they have caused Mr. Murray significant emotional and physical distress.

Plaintiffs are confident that they will be able to convince an impartial jury of West Virginians of the obvious: Defendants must be held accountable for their extraordinary and illegal conduct. But given that Defendants control the airwaves that flood the homes of West Virginians and have no qualms with using those airwaves to malign Mr. Murray and his companies, ultimate vindication requires equitable intervention in the interim.

20

D.    Injunctive Relief is in the Public Interest.

Finally, enjoining further broadcast of Defendants' original broadcast is undoubtedly in the public's interest for several reasons.

First, the public has a strong interest in seeing that justice is served—an interest that would be undermined by Plaintiffs' inability to obtain a fair trial by a jury that has not been tainted by Defendants' pervasive libel. *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1075 (1991) ("Few, if any, interests under the Constitution are more fundamental than the right to a fair trial by 'impartial' jurors, and an outcome affected by extrajudicial statements would violate that fundamental right.").

Second, the public has an interest in seeing that important topics are discussed truthfully and with civility.  Defendants' publication does neither.  And *re*publication of Defendants' defamatory comments will certainly add nothing to the debate. *See Rodriguez*, 5 F. Supp. 3d at 730-31 ("While the public also benefits from free and unfettered discourse, the minimal restriction on Plaintiff's proposed speech is justified by the circumstances of this case."); *Bingham*, N.Y.S.2d at 158 (rejecting defendant's "attempt to continue her offending communications 'as protected free speech'" because the First Amendment "'does not confer an absolute right to speak or publish, without responsibility, whatever one may choose'").

Defendants doubtless will resist an injunction using words such as "First Amendment" and "free speech."  But these rights do not give anyone the right to say anything, anywhere, to anyone.  Indeed, our Nation's founding founders and The Supreme Court of the United States have repeatedly noted that false and defamatory statements deserve no Constitutional protection:

> But there is no constitutional value in false statements of fact.  Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues. *New York Times Co. v.* Sullivan, 376 U.S., at 270.  They belong to that category of utterances which 'are no essential part of any exposition of ideas, and are of such slight

social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.' *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942).

*Gertz v. Robert Welch Inc.*, 418 U.S. 323, 340 (1974). The Supreme Court more recently reiterated this in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990):

> First Amendment protection for defendants in defamation actions surely demonstrate the Court's recognition of the amendment's vital guarantee of free and uninhibited discussion of public issues. But there is also another side to the equation; we have regularly acknowledged the important social values which underlie the law of defamation, and recognized that society has a pervasive and strong interest in preventing and redressing attacks upon reputation.

497 U.S. at 22 (internal quotation marks and citation omitted). Granting an injunction in this case will buttress society's "pervasive and strong interest in preventing and redressing attacks upon reputation," and is in the public's interest.

## II.   Plaintiffs Are Entitled to a Gag Order.

Plaintiffs are also entitled to a "gag order" prohibiting Defendants from discussing the substance of this litigation during the pendency of this action. "Few, if any, interests under the Constitution are more fundamental than the right to a fair trial by 'impartial' jurors, and an outcome affected by extrajudicial statements would violate that fundamental right." *Gentile*, 501 U.S. at 1075. Accordingly, this Court has the responsibility of ensuring that media coverage does not affect the fairness of the proceeding. *See Sheppard v. Maxwell*, 384 U.S. 333, 362-63 (1966) ("[T]he cure lies in those remedial measures that will prevent the prejudice at its inception. The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences."). And here, as discussed above, the media coverage of this litigation has already been extensive.

An order enjoining the parties from publicly speaking about a lawsuit is appropriate if: (1) the activity restrained poses either a clear and present danger or a serious and imminent threat

to a protected competing interest; (2) the order is narrowly drawn; and (3) less restrictive alternatives are not available. *See Wood v. Georgia*, 370 U.S. 375, 383-85 (1962); *Carroll v. President and Commissioners of Princess Anne*, 393 U.S. 175, 183-84 (1968); *Neb. Press Ass'n v. Stuart*, 427 U.S. 538, 563 (1976). Moreover, a gag order is constitutionally permissible if there is a reasonable likelihood that the extrajudicial statements of the parties will be a prejudice to a fair trial. *In re Russell*, 726 F.2d 1007, 1010-11 (4th Cir. 1984) (citing cases); *see also Sheppard*, 384 U.S. at 360-63 (suggesting that it is appropriate to impose greater restrictions on the free speech rights of trial participants than on the rights of nonparticipants).

Many jurisdictions have upheld gag orders. *See Levine v. U.S. Dist. Court for Cent. Dist.*, 764 F.2d 590, 595-96 (9th Cir. 1985) (citing cases).

Here, because the order requested does not restrict press coverage, but instead, affects only the statements the parties make to the media, it is narrowly tailored and is the least restrictive method available. *See Sheppard*, 384 U.S. at 361-63; *Neb. Press Ass'n*, 427 U.S. at 564 & n.8. The Court should enter an order prohibiting the parties from discussing the substance of this case.

*[Remainder of Page Intentionally Blank]*

23

## CONCLUSION

For all these reasons, Plaintiffs respectfully request that this Court enter a temporary restraining order and preliminary injunction ordering Defendants to remove their broadcast from the internet and cease from rebroadcasting it in any way, cease from broadcasting any such attacks on Mr. Murray and his companies in the future, and cease from commenting on this case to the media until the conclusion of the litigation. Due to the imminent and irreparable injury, loss, and damage that the Motion seeks to prevent, Plaintiffs respectfully request an expedited hearing on the Motion.

Dated: June 28, 2017

Respectfully submitted,

Of Counsel for Plaintiffs

Jeffrey A. Grove, Esq. (#6065)
David L. Delk, Jr., Esq. (#6883)
GROVE, HOLMSTRAND & DELK, PLLC
44 1/2 15th Street
Wheeling, WV 26003
(304) 905-1961
(304) 905-8628 (facsimile)

24

IN THE CIRCUIT COURT OF MARSHALL COUNTY, WEST VIRGINIA

THE MARSHALL COUNTY COAL COMPANY,
THE MARION COUNTY COAL COMPANY,
THE MONONGALIA COUNTY COAL COMPANY,
THE HARRISON COUNTY COAL COMPANY,
THE OHIO COUNTY COAL COMPANY,
MURRAY ENERGY CORPORATION, and
ROBERT E. MURRAY,

        Plaintiffs,

        v.

JOHN OLIVER, CHARLES WILSON,
PARTIALLY IMPORTANT PRODUCTIONS, LLC,
HOME BOX OFFICE, INC., TIME WARNER, INC.,
and DOES 1 through 10.

        Defendants.

Civil Action No. 17-C-124
Judge Jeffrey Cramer

## CERTIFICATE OF SERVICE

Service of the foregoing **PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** and **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** was had upon the following by forwarding a true and complete copy thereof, via regular United States Mail and Federal Express, this 28th day of June, 2017, as follows:

Thomas G. Hentoff
THentoff@wc.com
Williams & Connolly LLP
725 Twelfth Street, N.W.,
Washington, D.C. 20005
**(Counsel for Mr. John Oliver, Mr. Charles Wilson
Home Box Office, Inc., Time Warner, Inc. and
Partially Important Productions, LLC)**

Of Counsel for Plaintiffs

Jeffrey A. Grove, Esq. (#6065)
David L. Delk, Jr., Esq. (#6883)
GROVE, HOLMSTRAND & DELK, PLLC
44 1/2 15th Street
Wheeling, WV 26003
(304) 905-1961 / (304) 905-8628 (facsimile)